MOBIL OIL CORP. *v.* FEDERAL POWER
COMMISSION ET AL.

No. 73–437.  Argued April 17, 1974—Decided June 10, 1974*

---

*Together with No. 73–457, *Public Service Commission of New York* v. *Federal Power Commission et al.,* and No. 73–464, *Municipal Distributors Group* v. *Federal Power Commission et al.,* also on certiorari to the same court.

286

BRENNAN, J., delivered the opinion of the Court, in which all Members joined except STEWART and POWELL, JJ., who took no part in the consideration or decision of the cases.

*Carroll L. Gilliam* argued the cause for petitioner in No. 73–437. With him on the briefs were *Tom P. Hamill, Robert D. Haworth,* and *Philip R. Ehrenkranz. George E. Morrow* argued the cause for petitioners in Nos. 73–457 and 73–464. With him on the briefs for petitioner in No. 73–464 were *Ruben Goldberg* and *Charles F. Wheatley, Jr. Michael H. Rosenbloom* filed briefs for petitioner in No. 73–457.

*Leo E. Forquer* argued the cause for respondent Federal Power Commission in all cases. With him on the brief were *Solicitor General Bork, Mark L. Evans,* and *George W. McHenry, Jr. John R. Rebman* argued the cause for producer respondents in all cases. With him on the brief for respondents Exxon Corp. et al. were *Martin N. Erck, David G. Stevenson, Richard F. Generelly, Edward J. Kremer, Charles E. McGee, Cecil N. Cook, Thomas H.*

Burton, W. J. Stark, Warren M. Sparks, B. James McGraw, Robert W. Henderson, William A. Sackmann, John L. Williford, Paul W. Hicks, Oliver L. Stone, Ronald J. Jacobs, Richard F. Remmers, Stanley M. Morley, Louis Flax, H. W. Varner, Pat Timmons, Scott P. Anger, Kirk W. Weinert, C. Fielding Early, Jr., and George C. Bond. Raymond N. Shibley filed a brief for respondent Pipeline Purchaser Group in all cases. Francis R. Kirkham, James B. Atkin, Woollen H. Walshe, Justin R. Wolf, and David B. Ward filed a brief for respondent The California Company, a Division of Chevron Oil Co., in all cases. John E. Holtzinger, Jr., and Frederick Moring filed a brief for respondent Associated Gas Distributors in all cases. C. William Cooper, Tilford A. Jones, Edward H. Gerstenfield, Robert Corp, Norman A. Flaningam, Lauman Martin, Richard M. Merriman, Elmer Nafziger, Jon D. Noland, James O'Malley, Jr., Richard A. Rosan, William W. Ross, Thomas C. Matthews, Arthur R. Seder, Jr., Charles V. Shannon, Justin A. Stanley, and J. Stanley Stroud filed a brief for respondents United Distribution Companies in all cases.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

We review here the affirmance by the Court of Appeals for the Fifth Circuit of a 1971 order of the Federal Power Commission [1] that established an area rate structure for interstate sales [2] of natural gas produced in the Southern

---

[1] Opinion No. 598, 46 F. P. C. 86 (1971), together with the Commission's order correcting certain errors and denying rehearing as to all other issues, Opinion No. 598–A, 46 F. P. C. 633 (1971).

[2] As in Permian Basin Area Rate Cases, 390 U. S. 747, 754 n. 2 (1968), sales within the Commission's jurisdiction will, for convenience, be termed "jurisdictional" or "interstate" sales. See n. 17, infra.

Louisiana area. The Southern Louisiana area is one of seven geographical areas defined by the Commission for the purpose of prescribing areawide price ceilings.[3] This

---

[3] The Court of Appeals reported the status of area rate proceedings in 483 F. 2d 880, 886 n. 3. The Commission has updated that information as follows:

"1. *Permian Basin Area*

"Opinion Nos. 468 and 468–A, 34 FPC 159, and 1068, respectively (1965), affirmed *Permian Basin Area Rate Cases*, 390 U. S. 747 (1968)

"New rates for this area were established in:

"Opinion Nos. 662 and 662–A (*Area Rate Proceeding, Permian Basin Area*), —— FPC ——, ——, (Docket No. AR70–1 (Phase I), issued August 7, 1973, and September 28, 1973, respectively); pending review *sub nom. Chevron Oil Co., Western Division, et al.* v. *F. P. C.* (9th Cir. Nos. 73–2861, *et al.*, filed September 28, 1973)

"2. *Southern Louisiana Area*

"Opinion Nos. 546 and 546–A, 40 FPC 530, 41 FPC 301, respectively (1968), affirmed *sub nom. Austral Oil Co., et al.* v. *F. P. C.*, 428 F. 2d 407 (5th Cir. 1970), on rehearing, 444 F. 2d 125 (1970); certiorari denied *sub nom. Municipal Distributors Group* v. *F. P. C.*, 400 U. S. 950 (1970)

"New rates for this area were established in:

"Opinion Nos. 598 and 598–A, 46 FPC 86 and 633, respectively (1971), affirmed *sub nom. Placid Oil Co., et al.* v. *F. P. C.*, 483 F. 2d 880 (1973) [the instant case].

"3. *Texas Gulf Coast Area*

"Opinion Nos. 595 and 595–A, 45 FPC 674 and 46 FPC 827, respectively (1971), reversed and remanded *sub nom. Public Service Commission of the State of New York, et al.* v. *F. P. C.*, 487 F. 2d 1043 (D. C. Cir. 1973), certiorari pending *sub nom. Shell Oil Co., et al.* v. *Public Service Commission of the State of New York, et al.* (Sup. Ct. Nos. 73–966, *et al.*, filed December 22, 1973).

"4. *Hugoton-Anadarko Area*

"Opinion No. 586, 44 FPC 761 (1970), affirmed *sub nom. People of the State of California, et al.* v. *F. P. C.*, 466 F. 2d 974 (9th Cir. 1972).

"5. *Other Southwest Area*

"Opinion Nos. 607 and 607–A, 46 FPC 900 and 47 FPC 99, respectively (1971), affirmed *sub nom. Shell Oil Co., et al.* v. *F. P. C.*,

290

is the second area rate case to reach this Court. The first was the *Permian Basin Area Rate Cases*, 390 U. S. 747 (1968), in which the Court sustained the constitu-

---

484 F. 2d 469 (5th Cir. 1973), certiorari pending *sub nom. Mobil Oil Corp.* v. *F. P. C.* (Sup. Ct. No. 73–438, filed September 6, 1973).
"6. *Appalachian and Illinois Basin*

"Order Nos. 411, 411–A and 411–B, 44 FPC 1112, 1334 and 1487, respectively (1970) (these orders were never appealed).

"The Commission declined to establish new area rates for this area in Opinion No. 639, 48 FPC 1299 (1972), affirmed *sub nom. Shell Oil Co., et al.* v. *F. P. C.,* —— F. 2d —— (5th Cir. Nos. 73–1369, *et al.,* decided March 14, 1974).

"7. *Rocky Mountain Area*

"Opinion Nos. 658 and 658–A, 49 FPC 924 and —— FPC ——, respectively (1973), petition for review filed and dismissed on motion of petitioner *sub nom. Exxon Corporation* v. *F. P. C.* (D. C. Cir. No. 73–1854, dismissed February 22, 1974).

"Opinion Nos. 658 and 658–A prescribed just and reasonable rates for gas produced in this area from wells commenced prior to January 1, 1973 and sold under contracts dated prior to October 1, 1968. Sales from this area which are not covered by the rates established in Opinion Nos. 658 and 658–A will be governed by the rates prescribed in the Commission's pending nationwide rate proceedings (see below). Pending completion of the nationwide proceedings, such sales are being permanently certified under Section 7 of the Natural Gas Act, 15 U. S. C. 717f, at the initial rates prescribed in Order No. 435, 46 FPC 68 (1971) *sub nom. American Public Gas Association, et al.* v. *F. P. C.* (D. C. Cir. Nos. 72–1812, *et al.,* May 23, 1974)."

The Commission further advises that "[p]roceedings to establish uniform nationwide rates for all jurisdictional producer sales have been instituted at the Commission. When these proceedings are completed, the rates prescribed therein will supersede all area rates. As to gas from wells commenced on or after January 1, 1973, *see;*

"*Notice of Proposed Rulemaking and Order Prescribing Procedures,* 38 *Fed. Reg.* 10014 (Docket No. R–389–B, issued April 11, 1973).

"As to gas from wells commenced prior to January 1, 1973, *see;*
"*Notice of Proposed Rulemaking and Order Prescribing Procedures,*

tional and statutory authority of the Commission to adopt a system of area regulation and to impose supplementary requirements in the discharge of its responsibilities under §§ 4 and 5 of the Natural Gas Act[4] to determine whether producers' rates are just and reasonable.

The Court of Appeals affirmed the 1971 order in its

---

38 *Fed. Reg.* 14295 (Docket No. R–478, issued May 23, 1973)." Memorandum from General Counsel, FPC (May 17, 1974).

As to the Commission's shift from individual ratemaking through an adjudicative procedure to area ratemaking through a rulemaking procedure, see Dakin, Ratemaking as Rulemaking—The New Approach at the FPC: Ad Hoc Rulemaking in the Ratemaking Process, 1973 Duke L. J. 41.

[4] Sections 4 (a) and 5 (a), 15 U. S. C. §§ 717c (a) and 717d (a), respectively provide:

§ 4 (a) "All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful."

§ 5 (a) "Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

entirety as an appropriate exercise of administrative discretion supported by substantial evidence on the record as a whole. *Placid Oil Co.* v. *FPC*, 483 F. 2d 880 (1973). We granted the petitions for certiorari in these three cases [5] to review the correctness of the Court of Appeals' holding sustaining the 1971 order as in all respects within the Commission's statutory powers, and to determine whether the Court of Appeals misapprehended or grossly misapplied the substantial-evidence standard. 414 U. S. 1142 (1974). We affirm.

## I

The Commission first instituted proceedings to establish an area rate structure for the Southern Louisiana area on May 10, 1961. 25 F. P. C. 942. The area consists of the southern portion of the State of Louisiana and the federal and state areas of the Gulf of Mexico off the Louisiana coast. The area accounts for about one-third of the Nation's domestic natural gas production

[5] Petitioner in No. 73–437, Mobil Oil Corp., is a major producer of natural gas in the Southern Louisiana area. Petitioner in No. 73–457, Public Service Commission of the State of New York and petitioner in No. 73–464, Municipal Distributors Group— a group of approximately 200 municipally owned gas distributors— represent major consumer interests. Hereafter in this opinion they will be referred to respectively as "Mobil," "New York," and "MDG." Although all three attack at times the same provisions of the 1971 order, the attacks make different arguments as best serve the self-interest of the particular petitioner. Thus, the ceiling rate for flowing gas established by the Commission includes a noncost factor designed to facilitate investment by producers in exploration and development of new gas reserves. Mobil, understandably concerned with higher prices, argues that the noncost addition is not enough; indeed, that the rates fixed both for flowing gas and for new gas are too low. New York and MDG, on the other hand, concerned with lower prices, object that the rates for flowing gas are too high and reduce the level of refund obligations.

and has been described as "the most important gas-producing area in the country." *Southern Louisiana Area Rate Cases*, 428 F. 2d 407, 418 (CA5 1970) (hereafter *SoLa I*). Proceedings continued over seven years.[6] On September 25, 1968, the Commission issued an order establishing an area rate structure, 40 F. P. C. 530, and, on March 20, 1969, a modified order on rehearing, 41 F. P. C. 301.[7] Refunds under this structure for over-charges during the pendency of the proceeding amounted to some $375 million.[8]

An appeal was taken to the Court of Appeals for the Fifth Circuit. On March 19, 1970, the Court of Appeals

---

[6] Approximately five years were consumed by hearings, and the trial examiner's opinion issued on December 30, 1966, 40 F. P. C. 703.

[7] Pursuant to its authority, upheld in *Permian*, to use price flexibly, the Commission established three "vintages" for onshore gas delivered under contracts made, respectively, (1) before 1961, (2) between January 1, 1961, and October 1, 1968, and (3) after October 1, 1968. It set price ceilings for the three vintages, respectively, at 18.5¢ per thousand cubic feet (Mcf), 19.5¢ per Mcf, and 20¢ per Mcf. For offshore gas in the federal domain, which is not subject to the Louisiana severance tax, the ceilings were 1.5¢ per Mcf below onshore levels. The Commission also ordered refunds aggregating approximately $375 million for gas sold and delivered between the initiation of the proceedings and the effective date of its opinion, October 1, 1968, at prices above the established pre-October 1 ceilings. Finally, it established, subject to the right of individual producers to petition for exceptions, an indefinite moratorium on rate increases above the pre-October 1 ceilings, and a moratorium until January 1, 1974 (over five years), on rate increases above the post-October 1 maximum. Such moratoria provide for automatic suspension of any rate filing, without determination of justness and reasonableness. See, *e. g., United Gas* v. *Callery Properties*, 382 U. S. 223 (1965).

[8] As of the end of 1970, the precise amount of these refunds was $376,428,000, see 5 App. 237e, but they were accruing interest under terms of the Commission's order. Opinion No. 546, 40 F. P. C. 530 (1968).

affirmed the FPC orders but with "serious misgivings," *SoLa I, supra,* at 439. Noting that "[a] serious shortage, in fact, may already be unavoidable . . . ," *id.,* at 437, the Court of Appeals was critical of the Commission's failure adequately to assess "supply and demand in either a semi-quantitative or qualitative way," *id.,* at 436. It was reinforced in this view by the evidence, including an FPC Staff Report, issued while the appeal was pending,[9] that the Nation was faced with "a severe gas shortage, with disastrous effects on consumers and the economy alike." *Id.,* at 435 n. 87.

Therefore, although determining "that affirmance is the best course," *id.,* at 439, the Court of Appeals declared that the judgment was not in any wise to foreclose the Commission from making such changes in its orders, as to both past and future rates, as it found to be in the public interest. The court noticed the fact that, while the appeal was pending, the Commission, in March 1969, had instituted proceedings to reconsider rates for the offshore portion of Southern Louisiana, see 41 F. P. C. 378, and later that year expanded the procedure to include the entire area, 42 F. P. C. 1110. Thus, it stated:

> "The mandate of this Court should not, however, be interpreted to interfere with Commission action that would change the rates we have approved here. We

---

[9] See *SoLa I,* 428 F. 2d 407, 435 n. 87 (CA5 1970). This report was updated by FPC Staff Report No. 2, National Gas Supply and Demand 1971–1990 (1972), which states in part: " 'The emergence of a natural gas shortage during the past two years marks a historic turning point—the end of natural gas industry growth uninhibited by supply considerations. . . . For practical short-term purposes we are confronted with the fact that current proven reserves in the lower 48 states . . . have dropped from 289.3 trillion cubic feet [Tcf] in 1967 to 259.6 in 1970, a 10.3 percent drop within a three-year period. . . .' " *FPC* v. *Louisiana Power & Light Co.,* 406 U. S. 621, 626 n. 2 (1972).

specifically and emphatically reject the contention advanced . . . that the Commission has no power to set aside rates once determined by it to be just and reasonable when it has reason to believe its determinations may have been erroneous. In fact, the existence of the new proceedings, which as we understand them will take into account many of the issues whose absence has concerned us here, has been one of the factors we have considered in deciding to affirm the Commission's decisions." 428 F. 2d, at 444 445.

Pending decision on petitions for rehearing, however, the Commission advised the Court of Appeals, in a letter requested by the court, that, unless that court otherwise directed, it did not believe that it had authority to modify, rescind, or set aside a rate order or moratorium affirmed by the court. The Court of Appeals answered in its opinion denying rehearing, 444 F. 2d 125, 126–127 (1970):

"We wish to make crystal clear the authority of the Commission in this case to reopen *any* part of its order that circumstances require be reopened. Under section 19 (b) of the Natural Gas Act, this Court has the broad remedial powers that inhere in a court of equity, and pursuant to our equitable powers we make it part of the remedy in this case that the authority of the Commission to reopen any part of its orders, including those affecting revenues from gas already delivered, is left intact. The Commission can make retrospective as well as prospective adjustments in this case if it finds that it is in the public interest to do so.

"At the same time, we emphasize that our judgment is an affirmance and not a remand. The appropriate place for originally considering what

parts of the orders must be reopened in light of new evidence is before the Commission. It may be that the Commission will decide that the refunds it has ordered are just and reasonable or at least that their significance to the public interest is outweighed by the confusion and delay that would result from their reopening. In this event, the Commission will allow its refund orders to stand as they are. Or it may be that the refunds are too burdensome in light of new evidence to be in the public interest. In that case, it is our judgment that the Commission shall have the power and the duty to remedy the situation by changing its orders."

The Commission thereupon formally reopened the 1961 proceeding and consolidated it with the new proceeding, 44 F. P. C. 1638 (1970).[10] An extensive record of many thousands of pages of testimony and more than a hundred exhibits was compiled between April 1970 and March 1971.[11] Pursuant to the instructions of the Court of Appeals, much of the evidence focused on the gas shortage, projected levels of demand, and estimates of new supply needed to alleviate the problem. Evidence was also adduced bearing upon rate levels needed to induce additional supply, the potential industry consequences of any new order, and new cost trends based on data unavailable at the time of the earlier proceedings.

Contemporaneously with the hearings, settlement conferences were instituted, on motion, by the Presiding Examiner, 46 F. P. C. 86, 103 (1971), and those conferences were attended by producers, pipelines, distributors,

---

[10] On January 26, 1971, the consolidated proceeding was expanded to include all rate certification proceedings that had been, or would have been, initiated in the Southern Louisiana area during the pendency of the case. Pet. for Cert. of New York 9.

[11] 46 F. P. C., at 101.

state commissions, municipally owned utilities, and the Commission staff. Eventually, a settlement proposal was submitted by one of the parties,[12] and, after being placed on the record for comments, it was agreed to by a large majority of all interests.[13] An intermediate decision of the Presiding Examiner was waived, and the Commission took up the case.

At the outset, the Commission stated that it believed that adoption of the settlement proposal was precluded unless the Commission found the terms to be in the public interest and supported by substantial evidence.[14]

---

[12] United Distribution Companies, a group of 32 major distribution companies. *Id.*, at 103 n. 25.

[13] The Commission's tabulation stated:

"In support of the settlement proposal are 32 major distribution companies representing 25 percent of the gas distribution operations in the United States, serving about 10.3 million customers at retail; 55 gas distribution companies which supply gas service to more than 10 million customers; *all* interstate pipelines purchasing gas from the Southern Louisiana area; and 46 natural gas producers, comprising 80 percent of the total gas production flowing from the area. . . . The Commission staff likewise supported the settlement proposal." *Id.*, at 103.

[14] The Commission opinion states:

"We have more than a settlement proposal before us. We have the entire record made in the original Southern Louisiana proceedings, plus the record opened with the institution of Docket No. AR 69–1 and concluded after Docket No. AR 61–2 was consolidated with it. The settlement proposal was obviously heavily influenced by the teachings of [*SoLa I*], as the parties perceived those teachings, and so was the record made in conjunction with it. It is our duty to review that record and to make findings thereon, and to come to conclusions therefrom. Only if substantial evidence supports it can we approve the settlement proposal, and this means that we must analyze supply and demand, supply-cost relationships, and costing methodology. Rate design, incentives, refunds, and economic considerations, as the record permits insight into these matters, must also be discussed." *Id.*, at 106.

Accordingly, the Commission evaluated the proposal in the light of the massive record that had been compiled in the decade since 1961, including the additional year of hearings directed in large part to the terms of the settlement proposal and the nature of the supply shortage. The Commission concluded that the terms of the proposed settlement were just and reasonable, and found them to be supported by substantial evidence in the record.[15]  The ceiling rates established in the 1968 orders, which because of Commission and court stays had never gone into effect, were held "now [to] perform no office," 46 F. P. C., at 102.

The effective date of the 1971 order was August 1, 1971. By the terms of this order "flowing gas," *i. e.*, gas delivered after August 1, 1971, under contracts dated prior to October 1, 1968, receives treatment different from "new gas," *i. e.*, gas delivered after August 1, 1971, under contracts dated after October 1, 1968. The established flowing gas price ceilings are 22.275¢ per thousand cubic feet (Mcf) for gas produced onshore and 21.375¢ per Mcf for gas produced offshore. The established new gas price ceilings are 26¢ for both onshore and offshore gas.

Flowing gas ceilings automatically increased 0.5¢ per Mcf on October 1, 1973, and, as a further incentive for increasing the gas supply, the Commission also established increases up to 1.5¢ per Mcf, contingent upon the industry's finding and dedicating new gas reserves.[16]  New

---

[15] The Commission's conclusion that the rates were just and reasonable is to be found in 46 F. P. C., at 110. Conclusions that they were supported by substantial evidence appear throughout the opinion following appropriate examination of the record evidence. See, *e. g., id.,* at 131, 137–138, 142.

[16] Under the formula if, before October 1, 1977, the industry as a whole finds and dedicates to the interstate market new gas reserves in the Southern Louisiana area of seven and one half Tcf, the rate

gas rates automatically increase 1¢ per Mcf on October 1, 1974. A moratorium is imposed upon the filing of producer rate increases for flowing gas until October 1, 1976, and for new gas until October 1, 1977.

The Commission also established minimal pipeline rates to be charged producers by pipelines for the transportation of certain liquid and liquefiable hydrocarbons, and eliminated the price differential between casinghead gas (gas dissolved in or associated with the production of oil) and new gas-well gas that it had imposed in earlier cases. 46 F. P. C., at 144. See *Permian Basin,* 390 U. S., at 760–761.

The problem of refunds concerns deliveries of flowing gas prior to August 1, 1971. The rates established by the 1971 order were higher than those that would have been established under the 1968 order had they been put into effect.[17] If refunds had been calculated on the basis of the 1968 order, they would have aggregated over $375 million. If they had been calculated upon the basis of the 1971 flowing gas ceiling rates, refunds would have aggregated less than $150 million. However, the proposed settlement stipulated a refund obligation of $150 million, with a proviso that this could be worked off by the commitment by a refund obligor of additional gas reserves to the interstate market.[18] The Commis-

---

for flowing gas will escalate by 0.5¢; if, prior to that date, such reserves equal eleven and one quarter Tcf, the rate will increase by an additional 0.5¢; if, prior to the same date, such reserves equal 15 Tcf, a final 0.5¢ escalation will become effective. *Id.,* at 143.

[17] The rates that would have been established had the 1968 orders become effective ranged from 17¢ per Mcf to 20¢ per Mcf.

[18] The Commission's formula works thus: Any company with a "refund obligation" to any natural gas pipeline company is allowed to reduce the refund obligation by one cent for each Mcf of new gas reserves committed to the interstate market in the Southern Louisiana area during the period ending October 1, 1977. Any portion of the

sion adopted this proposal as an integral part of the 1961–1971 rate structure and established a schedule aggregating $150 million of refunds from those that were owed but not yet paid by producers who had collected rates in excess of certain prescribed levels lower than the established flowing gas rates.[19]

## II

Before addressing petitioners' arguments, we must consider briefly the situation in which the Commission has found itself in its attempts to regulate the natural gas market; the teachings of *Permian Basin* and other decisions of this Court as to the extent of the Commis-

"refund obligation" not so discharged is payable in cash with interest, subject to certain special relief provisions for producers who either achieve 65% of their obligations by August 1, 1976, or who have nonetheless made a "sincere and diligent effort" to discharge them. Opinion No. 598–A, 46 F. P. C. 633, 641 (1971). The producer is required to commit, or give right of first refusal to, at least 50% of the new reserves to the purchaser to whom the refund would otherwise be payable. The reserves committed to reduce the refund obligation may not be counted by the producer committing those reserves as a part of the industry reserves required to trigger the escalated prices for flowing gas referred to in n. 16 above.

[19] The rate levels for refund purposes are as follows:

(a) For deliveries prior to January 1, 1965, 20.625¢ per Mcf for onshore gas and 19.625¢ per Mcf for offshore gas.

(b) For deliveries from January 1, 1965, to September 30, 1968, 21.25¢ per Mcf for onshore gas and 20.25¢ per Mcf for offshore gas.

(c) For deliveries from October 1, 1968, to January 1, 1971, 30.5% of the difference between revenues during this period based on rates prior to October 1, 1970, and the revenues that would have resulted during this period through the application of rates established in *SoLa I*, as modified. This percentage factor of 30.5 may be increased to as high as 33% to produce the $150 million refund total.

(d) For deliveries after January 1, 1971, base area rates prescribed in the 1971 order, see 46 F. P. C., at 140.

sion's statutory authority in this area; the limitations upon review by the Court of Appeals of the Commission's order; and the limitations upon review by this Court of the Court of Appeals' affirmance of the order.

The history of the Commission's early experience with the Natural Gas Act, 15 U. S. C. § 717 *et seq.*, ,has been fully developed in our first area rate opinion, *Permian Basin, supra,* at 755–759, and may be merely summarized here. With the passage of the Act in 1938, 52 Stat. 821, Congress gave the Commission authority to determine and fix "just and reasonable rate[s]," § 5 (a), 15 U. S. C. § 717d (a),[20] for the "sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use . . . ." § 1 (b), 15 U. S. C. § 717 (b).[21] The Act was patterned after earlier regulatory statutes that applied to traditional public utilities and transportation companies, and that provided for setting rates equal to such companies' costs of service plus a reasonable rate of return.[22]

---

[20] See n. 4, *supra.*

[21] Section 717 (b) provides:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

[22] See, *e. g.,* Interstate Commerce Act, 49 U. S. C. § 1 *et seq.* See Kitch, Regulation of the Field Market for Natural Gas by the Federal Power Commission, 11 J. Law and Econ. 243 (1968); Note, Legislative History of the Natural Gas Act, 44 Geo. L. J. 695, 702, 704 (1956).

The contention was early made that in regulating the ultimate source of a production, here the natural-gas producer, the problem is not to ensure a reasonable rate of return, but to use prices func-

Until 1954, the Commission construed its mandate as requiring that it regulate the chain of distribution of natural gas only from the point where an interstate pipeline acquired it.[23] Because such pipelines were relatively

tionally to produce a supply that will satisfy a socially selected level of demand, and efficiently to allocate that supply. See *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 629 (1944) (separate opinion of Jackson, J.):

"The heart of this problem is the elusive, exhaustible, and irreplaceable nature of natural gas itself. Given sufficient money, we can produce any desired amount of railroad, bus, or steamship transportation, or communications facilities, or capacity for generation of electric energy, or for the manufacture of gas of a kind. In the service of such utilities one customer has little concern with the amount taken by another, one's waste will not deprive another, a volume of service can be created equal to demand, and today's demands will not exhaust or lessen capacity to serve tomorrow. But the wealth of Midas and the wit of man cannot produce or reproduce a natural gas field."

Compare, for a review of the possible purposes of natural gas regulation and the arguments for and against the scheme of the Natural Gas Act, Breyer & MacAvoy, The Natural Gas Shortage and the Regulation of Natural Gas Producers, 86 Harv. L. Rev. 941, especially 944–952 (1973).

[23] See *Columbian Fuel Corp.*, 2 F. P. C. 200 (1940); cases cited in *Permian Basin*, 390 U. S., at 756 n. 7. Section 1 (b), 15 U. S. C. § 717 (b), exempts "the production or gathering of natural gas" from the Act.

Both the reason for the Commission's view and the logical infirmity in it appear in the legislative history of the Act. The growing concentration of natural gas pipelines had led to traditional abuses associated with monopoly power—limitation of supply, discriminatory pricing, and barriers to entry. Hearings on H. R. 4008 before the House Committee on Interstate and Foreign Commerce, 75th Cong., 1st Sess., 47, 70–73, 89–91, 101–103 (1937). The States first proved incapable of combating these foreign corporations, *id.*, at 50, 93, and then were barred by decisions of this Court holding that such regulation violated the Interstate Commerce Clause. See, *e. g., Peoples Natural Gas Co.* v. *Public Service Comm'n*, 270 U. S. 550 (1926).

Congress' response was to take over where the States' power ceased, following the chain of distribution back into the interstate market,

few in number [24] and fell within the transportation company model, the Commission was able to apply a traditional regulatory approach, using individualized costs of service as a basis for determining price.[25]

In 1954, however, this Court ruled in *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672, that independent producers are "[n]atural-gas compan[ies]" within the meaning of § 2 (6) of the Act, 15 U. S. C. § 717a (6).[26] In response, the Commission at first attempted to extend to this new industry its old regulatory methods, including establishment of individual rates based on each producer's costs of service.[27]   The effort foundered on the sheer

---

and it quite naturally used a public utility model. But, once begun, prevention of the circumvention of such regulation virtually compelled extension of control to the source.

Although the debate continues today as to whether the production of natural gas is, or has the potential to be, competitive, compare Diener, Area Price Regulation in the Natural Gas Industry of Southern Louisiana, 46 Tul. L. Rev. 695 (1972) (not competitive), with Breyer & MacAvoy, The Natural Gas Shortage and the Regulation of Natural Gas Producers, 86 Harv. L. Rev. 941 (1973) (competitive), revision of the regulation required by the Act is a matter for consideration by the Congress, not by this Court. See *FPC* v. *Texaco, post,* at 400–401.

[24] Prior to the *Phillips* case there were fewer than 200 pipeline companies subject to Commission regulation. Statement of General Policy No. 61–1, 24 F. P. C. 818 (1960). Immediately prior to passage of the Act, four holding company groups controlled over 55% of the Nation's pipeline mileage. Hearings on H. R. 11662 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 12, 52 (1936).

[25] See *Phillips Petroleum Co.,* 24 F. P. C. 537, 542 (1960).

[26] Section 717a provides:

"When used in this chapter, unless the context otherwise requires—

.     .     .     .     .

"(6) 'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

[27] See *Phillips Petroleum Co., supra,* at 542.

size of the task—thousands of independent producers being engaged in jurisdictional sales of gas at that time.[28]

In the early 1960's the Commission discontinued its attempts to deal with individual companies,[29] and turned to the area rate method. The Commission established a number of discrete geographical areas within which it believed that costs and general operating conditions were reasonably similar,[30] and set out to establish, by convening hearings and compiling massive records, uniform rate schedules that would govern all producers within each area. Upon the conclusion of the first of these undertakings, we reviewed the Commission's efforts and found no reversible error. *Permian Basin Area Rate Cases*, 390 U. S. 747 (1968). See *Wisconsin* v. *FPC*, 373 U. S. 294 (1963). .

But, the Commission was soon confronted with indications, both from data available to it,[31] and from criticism of its effort,[32] that its cost emphasis in rate determination was being accompanied by a severe shortage in the supply of natural gas being dedicated to the interstate market. Since the Commission's subsequent area rate orders,[33] including both its 1968 and 1971 orders, are adapted from the initial *Permian Basin* model and are governed by the same statutory provisions concern-

---

[28] Various statistics presented by the Commission in its *Phillips* opinion on remand indicated a total of 3,372 independent producers with rates on file and an estimated backlog so large that, if the staff of the Commission were tripled, it would take over 82 years to reach current status. 24 F. P. C., at 545–546.

[29] Statement of General Policy No. 61–1, 24 F. P. C. 818 (1960).

[30] *Ibid.*

[31] See Opinion No. 598, 46 F. P. C., at 112–114 (American Gas Association, Committee on Natural Gas Reserves, Annual Reports).

[32] See, *e. g.*, Kitch, *supra*, n. 22, at 276–280. · See also *Permian Basin*, 390 U. S., at 816–817.

[33] See n. 3, *supra*.

ing ratemaking and judicial review, we will preface our discussion of the Commission's response to these difficulties with a brief review of the *Permian Basin* order and the applicable rules laid down in our opinion sustaining that order.

Subsequent to its establishment of geographical areas in 1961,[34] the Commission consolidated three of those areas to form the Permian Basin area. The rate structure devised for this area set two ceiling prices, the higher one for gas produced from gas wells and dedicated to interstate commerce after January 1, 1961, and the other for gas-well gas dedicated to interstate commerce before January 1, 1961, and all gas produced from oil wells (casinghead gas) either associated with the production of the oil or dissolved in it.[35] The Commission derived the higher rate for the newer "vintage" gas-well gas from composite cost data obtained both from answers to producer questionnaires and from published data said to reflect the national costs of finding and producing gas-well gas in 1960.[36] It derived the lower rate from Permian Basin historical cost data for the older vintage gas-well gas, and applied that rate to both that and casinghead gas without distinction.[37] To these composite costs, the Commission added a return of 12% [38] on the producers' average production investment,[39] obtained by examining the cost data, imputing a rate base, and assuming that gas wells deplete at a constant rate beginning one year after investment and ending 20

---

[34] Statement of General Policy No. 61–1, *supra.*

[35] *Permian Basin, supra,* at 759–760.

[36] *Id.,* at 761.

[37] *Ibid.;* cf. *infra,* at 329–330.

[38] The Commission has raised the rate of return to 15% in the instant case. 46 F. P. C., at 131.

[39] Cf. *ibid.*

years later.[40]  Finally, an adjustment up or down from the area ceiling rates was specified for gas of higher or lower quality and energy content than set by a selected standard.[41]  The resulting ceiling rates, including allowances for state taxes, were 14.5¢ per Mcf for first vintage and casinghead gas, and 16.5¢ for second vintage gas. For those producers who individually might suffer hardship under this rate schedule, the Commission indicated that it would on rare occasions provide special relief, but it declined to specify what circumstances would justify such action.[42]

On review, the Court of Appeals refused to approve the Commission's order, holding that certain determinations of the ultimate effects of the order had not been made as required by *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591 (1944), that more precise delineation of the requirements for relief from the order must be set forth, and that the Commission could not require that producers refund excess charges during the pendency of the proceeding unless it concluded that aggregate actual area revenues exceeded aggregate permissible area revenues, and then apportioned only the excess among producers on an equitable basis.   375 F. 2d 6, 36 (1967).

On certiorari, this Court initially noted that judicial review of the Commission's orders is extremely limited:

"Section 19 (b) of the Natural Gas Act provides without qualification that the 'finding of the Commission as to the facts, if supported by substantial

---

[40] Cf. *ibid.*

[41] See 46 F. P. C., at 143: "The maximum standard will be 1050 Btu's per cubic foot of gas, . . . and the minimum standard will be 1000 Btu's per cubic foot of gas."  Adjustments outside this range are to be on a proportional basis.  This was the standard used in *Permian Basin,* see 390 U. S., at 762–763.

[42] *Id.,* at 770–771.

evidence, shall be conclusive.' More important, we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' *FPC* v. *Hope Natural Gas Co., supra*, at 602. We are not obliged to examine each detail of the Commission's decision; if the 'total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.' *Ibid.*

"Moreover, this Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 585. No other rule would be consonant with the broad responsibilities given to the Commission by Congress; it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Permian Basin*, 390 U. S., at 767.

Applying these limitations in the context of review of area rate regulation, *Permian Basin* defined the criteria governing the scope of judicial review as follows:

"First, [the reviewing court] must determine whether the Commission's order, viewed in light of

the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. *The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.*" *Id.,* at 791–792 (emphasis supplied).

Where application of these criteria discloses no infirmities in the Commission's order, the order cannot be said to produce an "arbitrary result," and must be sustained. *FPC* v. *Hope Natural Gas Co.,* 320 U. S., at 602.

Applying these criteria, *Permian* reversed the Court of Appeals and sustained the Commission's order, although noting that the Commission had not adhered rigidly to a cost-based determination of rates, much less to one that based each producer's rates on his own costs.[43] Each deviation from cost-based pricing was found not to be unreasonable and to be consistent with the Commission's responsibility to consider not merely

[43] Indeed, in addition to its general approval of such an approach, see 390 U. S., at 814–815, the Court in *Permian Basin* listed each of the noncost factors used by the Commission and approved them. See *id.,* at 815 n. 98.

the interests of the producers in "maintain[ing] financial integrity, attract[ing] necessary capital, and fairly compensat[ing] investors for the risks they have assumed," but also "the relevant public interests, both existing and foreseeable." 390 U. S., at 792. "The Commission's responsibilities necessarily oblige it," the Court said, "to give continuing attention to values that may be reflected only imperfectly by producers' costs; a regulatory method that excluded as immaterial all but current or projected costs could not properly serve the consumer interests placed under the Commission's protection." *Id.*, at 815.

*Permian Basin* teaches that application of the three criteria of judicial review of Commission orders is primarily the task of the courts of appeals. For "this [the Supreme] Court's authority is essentially narrow and circumscribed." *Id.*, at 766. The responsibility to assess the record to determine whether agency findings are supported by substantial evidence is not ours. Section 19 (b) of the Act [44] provides that "[t]he judgment

---

[44] Section 19 (b), 15 U. S. C. § 717r (b), states:

"(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. . . . Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. . . . The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. . . . The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final,

and decree of the [Court of Appeals] affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court . . . upon certiorari . . . ." We have held as to a like provision in the National Labor Relations Act, 29 U. S. C. § 160 (e), that thus "[w]hether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals. This Court will intervene only in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied." *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474, 491 (1951).

## III

Before reviewing the Court of Appeals' affirmance of the Commission's 1971 order for compliance with *Permian*'s requirements, we address contentions that challenge the statutory authority of the Commission to adopt the order, rather than the terms of the order itself. The first of these challenges, made by New York and MDG, is that the Commission had no statutory authority to change rates and refund obligations fixed in the Commission's 1968 order after that order was affirmed by the Court of Appeals in *SoLa I.* Brief for MDG 18; Brief for New York 15. The argument is that the affirmance was "unqualified" and therefore exhausted the Court of Appeals' powers of review under § 19 (b), thus rendering its authorization to the Commission to reopen its 1968 orders without legal effect. But the affirmance of the 1968 order was not "unqualified." Although the Commission could not have reopened the order on its own, see *Montana-Dakota Utilities Co.* v. *Northwestern*

---

subject to review by the Supreme Court of the United States upon certiorari . . . ."

*Public Service Co.*, 341 U. S. 246, 254 (1951); *FPC* v. *Hope Natural Gas Co.*, 320 U. S., at 618, the Court of Appeals' opinion on rehearing made it "crystal clear" that, despite the form of the court's judgment, the Commission was fully authorized to reopen any part of the 1968 order that seemed appropriate and necessary if evidence as to the future supply problem indicated that this should be done.

The Court of Appeals properly took this step in light of new information, unavailable at the time of the 1968 order, that suggested the possible inadequacy of the 1968 determination, although not necessarily an inadequacy that justified setting aside the order. See *Baldwin* v. *Scott County Milling Co.*, 307 U. S. 478 (1939). Moreover, the 1968 order had not been made effective, being continuously stayed until withdrawn by the 1971 order. See 46 F. P. C., at 101. In these circumstances, we cannot say that the action of the Court of Appeals exceeded its powers under § 19 (b) "to affirm, modify, or set aside [an] order in whole or in part."

This jurisdiction to review the orders of the Commission is vested in a court with equity powers, *Natural Gas Pipeline Co.* v. *FPC*, 128 F. 2d 481 (CA7 1942), see *Ford Motor Co.* v. *NLRB*, 305 U. S. 364, 373 (1939), and we cannot say that the Court improperly exercised those powers in the circumstances. *Dolcin Corp.* v. *FTC*, 94 U. S. App. D. C. 247, 255–258, 219 F. 2d 742, 750–752 (1954).[45] Indeed, § 19 (b) provides that the Court of

[45] New York asserts (Brief 17–18) that the Court of Appeals "does *not* sit as a court of equity in reviewing actions of an administrative agency . . . ." We agree with and adopt the Commission's answer to that contention, Brief for Federal Power Commission 24 n. 20: "But the case it cites for that proposition, *Federal Radio Commission* v. *General Electric Co.*, 281 U. S. 464, is wholly inapposite. The issue there was whether [the Supreme] Court had jurisdiction to review a decision of the Court of Appeals for the District of Columbia set-

Appeals may authorize the Commission in proper cases to take new evidence, upon which the Commission may modify its findings of fact and make recommendations concerning the disposition of its original order. Under the Court of Appeals disposition, the 1968 order was therefore not final and thus it was within the power of the Commission to reconsider and change it. See *United Gas Improvement Co.* v. *Callery Properties,* 382 U. S. 223, 229 (1965).

Only New York presses the second challenge to the Commission's statutory authority to adopt the 1971 order. New York contends that the Commission is without power to adopt as a rate order a settlement proposal that lacks unanimous agreement of the parties to the proceeding. That contention has no merit.

The Commission clearly had the power to admit the agreement into the record—indeed, it was obliged to consider it.[46] That it was admitted for the record did

ting aside an order of the Federal Radio Commission. [The] Court held that it did not have jurisdiction, because under the pertinent statute the court of appeals, as a legislative court, was in effect 'a superior and revising agency' (281 U. S., at 467). The proceeding in the court of appeals thus 'was not a case or controversy in the sense of the judiciary article, but was an administrative proceeding, and therefore . . . the decision therein is not reviewable by [the Supreme] Court' (*id.,* at 470).

"[The Supreme] Court's statement that the court of appeals in such cases does not exercise 'ordinary jurisdiction at law or in equity' (*id.,* at 468) refers only to that court's former special role as a legislative court. It does not mean, as New York mistakenly infers, that reviewing courts exercising judicial rather than administrative jurisdiction do not sit as courts of equity. As [that] Court stated, the jurisdiction of reviewing courts under statutes similar to the Natural Gas Act is 'quite unlike the jurisdiction exercised on appeals from the Radio Commission' (*id.,* at 470)."

[46] Title 18 CFR § 1.18 (a) provides:

"(a) *To adjust or settle proceedings.* In order to provide opportunity for the submission and consideration of facts, arguments, offers

not, of course, establish without more the justness and reasonableness of its terms. But the Commission did not treat it as such. As we have noted,[47] the Commission weighed its terms by reference to the entire record in the Southern Louisiana area proceeding since 1961, and further supplemented that record with extensive testimony and exhibits directed at the proposal's terms.[48] We think that the Court of Appeals correctly analyzed the situation and stated the correct legal principles:

"No one seriously doubts the power—indeed, the duty—of FPC to consider the terms of a proposed settlement which fails to receive unanimous support as a decision on the merits. We agree with the D. C. Circuit that even 'assuming that under the Commission's rules [a party's] rejection of the settlement rendered the proposal ineffective *as a settlement,* it could not, and we believe should not,

of settlement, or proposals of adjustment, for settlement of a proceeding, or any of the issues therein, or consideration of means by which the conduct of the hearing may be facilitated and the disposition of the proceeding expedited, conferences between the parties to the proceeding and staff for such purposes may be held at any time prior to or during such hearings before the Commission or the officer designated to preside thereat as time, the nature of the proceeding, and the public interest may permit."

[47] See text accompanying nn. 7–8, *supra.*

[48] The Appendix filed in this Court, and containing only those portions of the record designated by the parties, includes over 800 pages of testimony and over 300 pages of exhibits from the reopened proceedings. We note that four different cost studies were presented. These studies estimated costs of production ranging from 18.2¢ to 24.03¢ per Mcf for gas flowing under contracts dated prior to October 1, 1968. With respect to gas sold under contracts dated on or after October 1, 1968, the cost estimates based on a 1969 test year ranged from 19.39¢ to 38.02¢. The rates ultimately fixed by the Commission, even including incentive increments, were within the range of cost estimates.

have precluded the Commission from considering the proposal *on its merits.'* Michigan Consolidated Gas Co. v. FPC, 1960, 108 U. S. App. D. C. 409, 283 F. 2d 204, 224 . . . .

. . . . .

"As it should FPC is employing its settlement power under the APA, 5 U. S. C. A. § 554 (c), and its own rules 18 C. F. R. § 1.18 (a), to further the resolution of area rate proceedings. If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if FPC makes an independent finding supported by 'substantial evidence on the record as a whole' that the proposal will establish 'just and reasonable' rates for the area." 483 F. 2d, at 893. (Emphasis in original.)

The choice of an appropriate structure for the rate order is a matter of Commission discretion, to be tested by its effects. The choice is not the less appropriate because the Commission did not conceive of the structure independently.

New York presents a final argument against the Commission's authority. It contends that the Court of Appeals' opinion on rehearing in *SoLa I* authorized modification of the 1968 refund provisions only if the 1968 refunds "are too burdensome in light of new evidence to be in the public interest." 444 F. 2d, at 127. It argues that this means the Commission was required first to find, based on substantial new evidence, that refunds "would substantially and adversely affect the producers' ability to meet the continuing gas needs of the interstate market," Brief for New York 18, and contends that the

revision of the refund terms is therefore unauthorized because the Commission made no such finding. New York's premise is unsupportable. The opinion on rehearing is explicit that the Commission was to have "great flexibility," and could "make retrospective as well as prospective adjustments in this case if it finds that it is in the public interest to do so." 444 F. 2d, at 126–127. Moreover, in the opinion under review, the Court of Appeals flatly rejected the argument New York has repeated in this Court. "[W]e categorically rejected [in *SoLa I*] the notion that the label 'affirmance' could possibly impair FPC's ability to alter or modify *any* of the provisions, particularly the refund provisions, of its *SoLa I* rate scheme if it believed that the exigencies of the gas industry required more effective remedial measures." 483 F. 2d, at 904 (emphasis in original).

## IV

We turn now to petitioners' challenges to the rate order itself. We treat these contentions in three groups: challenges to the established price levels, challenges to the Commission's allocation of gas and receipts among pipelines and producers through the refund credits and contingent escalations, and, finally, claims that certain specific provisions of the rate order lack substantial evidence.

## A

Petitioner Mobil contends that the rates fixed for both flowing or first vintage gas and new or second vintage gas are too low. New York and MDG attack the rates for flowing gas as too high, but do not attack the new-gas rates. Each of the arguments is premised on a common error: that certain provisions of the order can be isolated and viewed without regard to the total effect the order is designed to achieve.

Mobil's attack on the Commission's evidence of costs is clearly frivolous. The Commission took extensive evidence of costs in its 1968-order hearings for flowing gas, and in both its 1968-order and 1971-order hearings for new gas. In response to the Commission's rates, selected from the final cost "range" it found to be justifiable on the basis of the entire record, Mobil points to selected fragments of the record. We have examined the testimony cited and do not think that it sustains Mobil's heavy burden of showing that the final Commission choice was outside what the Court of Appeals could have found to lie within the Commission's authority. *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 585 (1942).

Mobil further contends that the inclusion of refund workoff credits and contingent escalations in the Commission's just and reasonable rates indicates that producers unable to gain part or all of their share of such payments will receive merely their "bare-bones" costs, which constitute illegally low prices. We do not question that such producers may receive less per unit of gas than will others. But that hardly invalidates the Commission's order. See *Permian Basin*, 390 U. S., at 818–819. Mobil's argument assumes that there is only one just and reasonable rate possible for each vintage of gas, and that this rate must be based entirely on some concept of cost plus a reasonable rate of return. We rejected this argument in *Permian Basin* and we reject it again here. The Commission explicitly based its additional "noncost" incentives on the evidence of a need for increased supplies. Obviously a price sufficient to maintain a producer, while not itself necessarily required by the Act,[49] may not be sufficient also to encourage an increase

---

[49] See *Permian Basin*, 390 U. S., at 769–770. We said there: "[T]he just and reasonable standard of the Natural Gas Act 'coincides' with the applicable constitutional standards, *FPC* v. *Natural*

in production.  As we said in *Permian Basin, supra,* at 796–798:

> "The supply of gas-well gas is therefore relatively elastic, and its price can meaningfully be employed by the Commission to encourage exploration and production. . . .
>
> ". . . We have emphasized that courts are without authority to set aside any rate adopted by the Commission which is within a 'zone of reasonableness.' . . . The Commission may, within this zone, employ price functionally in order to achieve relevant regulatory purposes; it may, in particular, take fully into account the probable consequences of a given price level for future programs of exploration and production.  Nothing in the purposes or history of the Act forbids the Commission to require different prices for different sales, even if the distinctions are unrelated to quality, if these arrangements are 'necessary or appropriate to carry out the provisions of this Act.' . . . We hold that the statutory 'just and reasonable' standard permits the Commission to require differences in price for simultaneous sales of gas of identical quality, if it has permissibly found that such differences will effectively serve the regulatory purposes contemplated by Congress."

Plainly the Court of Appeals did not err in deciding that it was well within Commission discretion and exper-

---

*Gas Pipeline Co.,* [315 U. S. 575,] 586, and any rate selected by the Commission from the broad zone of reasonableness permitted by the Act cannot properly be attacked as confiscatory." *Id.,* at 770. The Court then refused to invalidate, without reference to particular cases, a Commission plan to provide " 'appropriate relief' if [a producer] establishes that its 'out-of-pocket expenses in connection with the operation of a particular well' exceed its revenue from the well under the applicable area price." *Id.,* at 770–771.

tise to conclude that the refund workoff credits and contingent escalations could provide opportunity for increased prices that would help in generating capital funds and in meeting rising costs, while assuring that such increases would not be levied upon consumers unless accompanied by increased supplies of gas. It is true that the Commission concluded that it could not determine the precise amount of additional gas supply that would be found and dedicated to interstate sales as a result of this formula. But this was also true of any change it might have made in gas prices. The Commission took massive evidence on supply, demand, and the relation between the two.[50] Its difficulties, while not minor,[51] did not stem from any failure to seek answers.

[50] See n. 48, *supra*. The evidence is set out at length and discussed in 46 F. P. C., at 110–123.

[51] This is well exemplified by the problems arising from the fact that many costs are jointly incurred in the production of oil, gas, and other hydrocarbons. One witness testified that any number of accounting methods may be used to allocate such costs, and listed 10 of them. 4 App. 635–637. He further testified that these methods would produce a widely varying range of results, and that a choice of one of them was largely a matter of preference. The Commission's determination to use a "modified Btu" approach, whereby a Btu of natural gas is assumed to be "worth" only a selected fraction of a Btu of oil, is a policy choice having significant consequences for the industry. The same witness testified that switching from the Commission's assumption in its 1968 opinion that a Btu of oil is worth 3.5 times a Btu of natural gas to a 2.34 factor would make several cents' difference in the ceiling rates. *Id.*, at 550. An assumption of equality would thus appear likely to have a large impact. Yet no market price comparison of the values of oil and gas is available for the interstate market since the Commission sets the price of natural gas.

Moreover, another witness testified that, since natural gas competes with oil in many markets, producers of both harm themselves when they expand their production of natural gas under the restraint of price ceilings. *Id.*, at 476–481. Cf. n. 23, *supra*.

Rather, the Commission pointed out that the results of exploratory activity are by nature dependent to some extent on chance, and the level of exploratory activity in turn may be influenced by many other factors besides price, including, the Commission said, "monetary inflation, changes in real cost of input resources, availability of input resources, changes in alternative investment opportunities, development of new producing areas, size of prospective reservoirs, changes in business confidence, degree of directionality of exploratory effort [toward gas or oil], changes in industry technology, and other factors influencing business decisions." [52]   We think the record sufficiently supports the Commission's conclusion:

> "Summarizing, there exists a positive relationship between gas contract price levels and exploratory effort; no reliable quantitative forecasts may be made by increments of additional gas supply resulting from specific increased gas prices; increases in ceiling prices which yield increases in producer revenues will result in expanded gas exploration activity; and the adequacy of expanded gas exploratory activity in terms of sufficiency of gas supply in relation to gas demands must be determined by continued Commission observation of the results of our decisions." 46 F. P. C., at 124.

New York's contention that the rates on flowing or first vintage gas are not supported by substantial evidence is also predicated on an erroneously limited view of the permissible range of the Commission's authority to employ price to encourage exploration or production. Reduced to simplest form, New York's contention is that the 1968 order set just and reasonable rates for first vintage gas, that no new evidence was introduced as to the

[52] 46 F. P. C., at 121.

cost of that gas, and that the 1971-order prices for that gas are consequently excessive. Again, as we said in *Permian,* the Commission is not so limited in its construction of rate formulae. Its justification here for increasing the price of flowing or first vintage gas was not that new evidence showed that the conditions of producing that gas differed from the conditions found in the 1968 opinion, but, as the Commission frankly acknowledged, new revenues were deemed necessary to expand future production. As between placing the burden of that expansion on new or second vintage gas alone or spreading it over both old and new gas, it judged the latter more equitable and more likely to lead to the immediately increased capital necessary in the face of a crisis. We see nothing in New York's argument to suggest that the Commission could not—in view of its finding that increased revenues were necessary—place the burden of those payments on all users rather than on those alone who purchased gas in the future. Indeed, it is worth noting that the Commission's rate orders in *Permian* included in the cost components of gas a noncost price element for future expansion of exploratory effort.[53]

In this situation, the Commission could reasonably choose its formula as an appropriate mechanism for protecting the public interest. And, against the background of a serious and growing domestic gas shortage, the Court

---

[53] See *Permian Basin,* 390 U. S., at 815 n. 98. With the introduction of the formula used in this case, the Commission stated:

*"Adjustment for Exploration in Excess of Production.* This adjustment was designed, in prior cases, to continue to provide findings in excess of production. At the present time, findings of nonassociated gas are substantially less than production . . . . As we indicated in *Texas Gulf Coast,* our concept of economic costing includes the costs of eliciting the required exploratory and drilling effort. Thus, there is no reason to consider special allowance categories." 46 F. P. C., at 133.

of Appeals could certainly conclude that the Commission might reasonably decide that, as compared with adjustments in the rate ceilings for gas producers to induce more exploration and production, its responsibility to maintain adequate supplies at the lowest reasonable rate could better be discharged by means of the contingent escalation and refund credit provisions. We therefore agree with the Court of Appeals' holding that "these periodic escalations were a proper subject for the exercise of administrative discretion and clearly fall within that 'zone of reasonableness' which we allow FPC on review." 483 F. 2d, at 908.

## B

Mobil, New York, and MDG all raise claims that even if the Commission's rates are sufficient to satisfy the Act's minimum requirements as to amount and, on the basis of the Commission's chosen methodology, are supported by substantial evidence, they are nonetheless unduly discriminatory and therefore unlawful under §§ 4 and 5 of the Act. This attack is directed both to the contingent escalations on flowing or first vintage gas and to the refund credits.

The background to Mobil's argument is a Commission program inaugurated after promulgation in 1960 of guidelines for area rate regulation. *Statement of General Policy No. 61-1*, 24 F. P. C. 818 (1960); *Fourth Amendment to Statement of General Policy No. 61-1*, 26 F. P. C. 661 (1961). That program was aimed at disposing of claims arising from rates that exceeded guideline levels. The program encouraged settlement of contested rate dockets and resulted in substantial producer refunds, reduction of producer rates to guideline levels, and moratoria on producer rate increases for substantial periods. Major producers like Mobil that cooperated with the program thus had little if any refund obligation to "work

off" among the $150 million refunds directed by the 1971 order, whereas producers who for over a decade had not cooperated with FPC but had continued collection of higher rates, had high refund liabilities, and thus enjoyed the benefits of the refund credit formula. Mobil contends undue discrimination results because these producers earn refund credits by dedicating new natural gas reserves which are not counted toward industry escalations, yet also receive all escalations in flowing gas ceiling rates earned by dedication of new natural gas reserves by other producers. Moreover, Mobil's argument continues, the refund credits provide the noncooperating producers with working capital they may use, for example, in competitive lease biddings and other corporate activities, while cooperating producers like Mobil are not allowed comparable allowances in the revenues to be realized from the area rates.

The Commission squarely faced up to the Mobil argument as follows, 46 F. P. C., at 109–110:

"The substance of their argument is that the rate design in the settlement proposal unlawfully discriminates against producers who in the past cooperated with the Commission and consumer and distributor interests by executing companywide settlements, and made refunds which reduced their revenues to the general level of the Commission's Section 7 guideline level, and in favor of producers who did not enter into such rate settlements or otherwise reduce their contested Section 4 and Section 7 rates. The latter . . . in the meantime have collected rates considerably higher than those realized by the group which settled. Under the proposed settlement, as Mobil points out, one group is in effect rewarded for their relative intransigence—they will be able to retain revenues collected up to the agreed 22.375¢

(where their contracts permit) and achieve a favored revenue position.

   .       .       .       .       .

"The logic of this [Mobil's] position cannot be assailed. Candor requires us to admit that some of the predicted inequities as among producers will surely occur, and those who have attempted to work 'within the system' are comparatively disadvantaged. We have chosen to go the route of the alternative rate design suggested in the [settlement] proposal. The inequitable consequences which might flow from it have to be compared with its advantages, and . . . no scheme can be free of some inequities. The broader acceptability of the [settlement] proposal with the distributor group impels us to act as we do."

In other words, it was the Commission's judgment that even though the refund credit device does not operate as favorably for producers who paid refunds and lowered rates, the advantages in the public interest that could result from encouraging exploration and increased production overrode such possible inequitable consequences. The Court of Appeals held that in thus striking the balance, the Commission acted within its statutory authority upon substantial evidence. The Court of Appeals stated, 483 F. 2d, at 905:

"FPC concluded that the overall structure would stimulate greater exploration and development and have a general pro-competitive effect. We will not reject an administrative decision merely because one producer's piece of cake is iced and another's is not. The crucial factor, in total alignment with both *Permian* and *SoLa I,* is that both get *some* cake. Given the wisdom of the administrative de-

> sire to elicit new supply, and accepting the proposition that the incalculable relationship between rate and supply is positive, we refuse to tamper with an overall program which effectively exploits that relationship. FPC's order setting the total refund obligation of all gas producers in [the Southern Louisiana area] is therefore fully sustained."

The question ultimately becomes whether this degree of discrimination in some of the provisions of the rate order renders the order unjust and unreasonable as a whole, despite its overall balance of effects and purposes. Obviously, some discrimination arises from the mere fact of area, rather than individual-producer, regulation, but *Permian* held such effects justified. Similarly, departure from cost basing in setting rates can, on Mobil's theory of the meaning of "discrimination," be said to be discriminatory, but *Permian* held that this too may be justified by other regulatory concerns. Here, although the impact on Mobil exists, the size of that impact will depend on the fortuity of other producers' success in future exploratory efforts, and, of course, the favorable terms of its settlement would have to be considered in mitigation of that impact.

We cannot say that the Court of Appeals misapprehended or grossly misapplied the substantial-evidence standard in concluding that the Commission's assessment of the need for the refund credits, compared to the costs and benefits of some other scheme, was adequately supported. Mobil voluntarily exercised a business judgment in deciding early in the course of the proceedings to compromise in advance refund liabilities that might be imposed upon it at the conclusion of the various rate proceedings. In a sense, therefore, the claimed discrimination arises solely from its voluntary decision. This was part of the Commission's answer to Mobil's con-

tention, 46 F. P. C., at 135, "Parties who enter into settlements or those who refuse to do so, always run the risk that the ultimate Commission determination may be higher or lower than the settlement levels." And the Court of Appeals pointed out, 483 F. 2d, at 906 n. 31: "If the [1971] rates were lower than those established in these agreements, the private settlements would have been worthwhile. As it turns out, FPC was more generous in [1971] than was anticipated. But this clearly furnishes no basis for attack." Moreover, it is a matter of speculation whether Mobil's gain from its settlement actually might be less advantageous than its hypothetical gains from refund credits.

New York and MDG argue that the refund credit formula is discriminatory against pipeline purchasers because it permits producers to work off refunds by offering 50%, rather than 100%, of the new reserves to pipeline purchasers other than those owed the refunds. It may suffice to answer that the pipeline purchasers affected make no complaint. In any event, since the purpose of the device is to increase supply, we cannot say that the Court of Appeals erred in holding that the provision was within Commission discretion. The record shows that two-thirds of the refund obligations are owed to three of the 14 pipeline companies serving the area.[54] The Commission could reasonably conclude that in guaranteeing that 50% of the new reserves must be offered to these three companies, their producers' incentive to explore for and produce new gas anywhere in the area, could result in their dedication of new reserves that would exceed in benefit the amount of the refunds.

It is also contended that, because the work-off provision of the order applies entirely to present producers, the

---

[54] See 5 App. 266e.

work-off provision "imperil[s] the entry of new producer entrants and [gives] a competitive advantage to producers who had charged the most unreasonable rates in the past." Brief for MDG 47. The 0.5¢ per Mcf incentive increases on flowing gas are attacked on the same ground. Brief for New York 37. The Court of Appeals, addressing this attack upon both the contingent escalation provisions and the refund work-offs, sufficiently answered these arguments:

> "And for that unnamed new market entrant, for whom much concern is expressed, we fail to see why he would be in the least bit dissuaded from committing new reserves at 26¢/Mcf by the fact that it might allow some of his competitors to raise their 22.375¢/Mcf flowing gas price by a half-penny." 483 F. 2d, at 908.

Finally, New York argues that some producers might abandon their normal business of exploring for and developing new reserves and yet enjoy the 0.5¢ per Mcf increase in their prices for flowing gas if other producers go ahead and contribute substantial additional reserves. We are not persuaded. The Commission's belief that producers already operating in the area will continue to do so is certainly at least an equally tenable judgment.

The Commission's purpose is to obtain increasing production of gas, and its targets are not so demonstrably unrelated as to justify acceptance of New York's fears that contingent escalations will have a negative effect on overall exploratory effort. In any event, other than the expressed fears, New York offered nothing to overcome the "presumption of validity [that] attaches to each exercise of the Commission's expertise. . . . [T]hose who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing

that it is invalid because it is unjust and unreasonable in its consequences.' " *Permian Basin,* 390 U. S., at 767.

## C

We come last in our consideration of the Commission's order to a series of more narrowly drawn objections raised by the various parties. Mobil objects to the Commission's fixing of moratoria on new rate filings—until October 1, 1976, for flowing or first vintage gas contracts, and until October 1, 1977, for new or second vintage gas contracts. It contends that those provisions are unsupported by required findings of fact and by substantial evidence. The Court of Appeals reached a contrary conclusion and we are not able to say that this conclusion misapprehended or grossly misapplied the substantial-evidence standard. We pointed out in *Permian Basin* that, unless raised as an attack on the viability of the entire order, such claims are, at best, premature. It is true, as Mobil argues, that the underlying conditions of stability justifying the moratorium in *Permian* have been found by the Commission to be no longer true. But the Commission has responsively shifted from reliance upon stable prices to reliance upon automatic escalations together with refund credits and contingent escalations. Even as to producers like Mobil that settled (for a yet-unknown financial benefit) their refund obligations, the contingent escalations and automatic escalations introduced for the purpose of both encouraging increased exploratory activity and covering inflation costs offer adequate assurances of keeping those producers above that line where a moratorium might run afoul of the minimum return required under the Act and the Constitution. See *Permian Basin, supra,* at 769–771.

In addition, as the Court of Appeals said:

"[T]here are several alternative methods by which

a single aggrieved producer may establish higher rates as his circumstances warrant. . . . Thus, the system is so structured that FPC can retain industry and area wide rate stability for a period of at least five years while simultaneously protecting the financial integrity of the individual producer. And if the change in circumstances is so widespread that the area rate is no longer economically feasible as set, FPC has the power to lift its moratorium or establish new area rates, or both." 483 F. 2d, at 909.

Mobil also complains that the Commission failed to provide automatic adjustments in area rates to compensate for anticipated higher royalty costs. It relies on *Mobil Oil Corp.* v. *FPC,* 149 U. S. App. D. C. 310, 463 F. 2d 256 (1972),where the Court of Appeals for the District of Columbia Circuit reversed a Commission holding that subjected royalties to FPC administrative ceilings. Mobil argues that under that decision the 1971 rate schedules must take into account the possibility of higher royalty obligations. We agree with the Court of Appeals that Mobil's argument is hypothetical at this stage and that in any event an affected producer is entitled to seek individualized relief. The Court of Appeals said:

"[W]e are not willing to alter or stay the implementation of area wide rates for the entire industry merely on the basis of what *might* happen to *some* producers' costs *if* [the District of Columbia Circuit's] statement of the law prevails.

"If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition FPC for individualized relief. *Permian* contemplated it." 483 F. 2d, at 911 (emphasis in original).

New York objects to the Commission's elimination of

the distinction in maximum permissible rates between casinghead gas and gas-well gas so far as new dedications are concerned. Casinghead gas has traditionally been treated as a byproduct of oil and therefore costed and priced lower than gas-well gas. The Court of Appeals held that "FPC acted within the bounds of administrative propriety in abandoning any such distinction." *Id.*, at 910. We cannot say that this conclusion, supported by the following reasoning, was error:

> "We believe that several considerations support this course of action: (i) 'the exigencies of administration demand the smallest possible number of separate area rates,' *Permian, supra,* 390 U. S. at 761, . . . (ii) there is a serious problem of allocating the proper amount of exploration and development expenses between oil and gas, see *SoLa I:* 428 F. 2d 422 n. 30, (iii) imposing a lower price on casinghead gas might ' "invite the divergence of such gas to the intrastate market," ' Op: 598, ¶ 167, and (iv) making the production of casinghead gas economically unfeasible might encourage profit-minded producers to flare it rather than market it—thus making natural gas in [the Southern Louisiana area] not merely a wast*ing* but a wast*ed,* asset. . . ." 483 F. 2d, at 909 (emphasis in original).[55]

Such pragmatic adjustments were used in *Permian Basin* as a way of equating first vintage gas and all casinghead gas, new and old. All that the Commission has done

---

[55] In its opinion on rehearing the Commission stated, 46 F. P. C., at 636–637:

"We note, again, that the Btu content of casinghead and gas-well gas is about the same, and the record shows that substantial volumes of casinghead gas are being flared in Southern Louisiana—reason in itself for eliminating the price discrimination."

here is to equate all new casinghead gas with all new gas just as old casinghead gas has always been equated with old gas-well gas.

Mobil complains of the provision of the order that established minimum rates to be paid by producers to pipelines for transportation of liquids and liquefiable hydrocarbons. Mobil argues that these minimum rates are not supported by substantial evidence. The Court of Appeals disagreed. "We have examined the testimony regarding this matter and conclude that FPC had a substantial evidentiary basis from which it could conclude that the particular rates which it established should supply a reasonable floor on these charges. This answers Mobil's objection." *Id.,* at 911. Mobil has not met its burden of demonstrating that the Court of Appeals misapprehended or grossly misapplied the substantial-evidence standard.

## V

The overriding objective of the Commission was, as the Court of Appeals observed, to adopt "a total rate structure to motivate private producers to fully develop [the Southern Louisiana area's] resources." *Id.,* at 891. The Commission's findings, 46 F. P. C., at 102, emphasize that goal:

> "Our duty is to take all the action we believe necessary to reverse a downtrend of the exploration and development effort, thereby to increase the likelihood of augmenting the national inventory of proved reserves of natural gas. We would be derelict—we can think of no softer word—if we were to be guided by the legalisms of the past in seeking solutions to the problems which have grown like

barnacles as this case has aged and its size has mounted."

Features of the 1971 order designed to increase supplies of natural gas may strike some as novel but we have emphasized that the Commission "must be free . . . to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Permian,* 390 U. S., at 767. That principle has obvious applicability in this time of acute energy shortage. This accents the observation, apparently still the case, that "area regulation of producer prices is avowedly still experimental in its terms and uncertain in its ultimate consequences." *Id.,* at 772. For, as the Court of Appeals said:

"Cast in the perspective of the human travail, some might say that the dozen year experience with area rate regulation should arguably justify a holding that the experimental phase has passed. In 1971, . . . however, FPC had only twice been the beneficiary of the judicial function to declare 'what the law is'. No one can honestly say that judges have been any more sure than commissioners, as all struggle with a problem that grows out of the peculiar mixture of a simultaneous service and exhaustion of a depletable asset. All have been groping. The day for groping is not yet over. And it does not denigrate what FPC has done to say that much may yet be imperfect and much remains to be done or redone. So we can find that FPC has conscientiously attempted to establish 'just and reasonable' rates within the framework allowed by judicial precedent, yet, it is still experimenting." 483 F. 2d, at 889.

We cannot now hold that, in these circumstances, the Court of Appeals erred in deciding that the Commission's

1971 order was an appropriate exercise of administrative discretion supported by substantial evidence.

*Affirmed.*

MR. JUSTICE STEWART and MR. JUSTICE POWELL took no part in the consideration or decision of these cases.