**UNITED GAS PIPE LINE COMPANY, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 79–3698.

United States Court of Appeals, Fifth Circuit.*

Oct. 1, 1981.

Rehearing Denied Nov. 16, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Thomas G. Johnson, Robert A. Hasty, Jr., Houston, Tex., for Shell Oil Co.

John H. Cheatham, III, Lawrence V. Robertson, Jr., Washington, D. C., for Interstate Natural Gas Assoc.

David Aston, Dallas, Tex., for Atlantic Richfield Co.

William A. Sackmann, Findlay, Ohio, for Marathon Oil Co.

Robert H. Jablon, Washington, D. C., for Utilities Com'n of New Smyrna Beach, Fla., Electricities of N. C., Belmont Mun. Light Dept., Mass., and city of Shrewsbury, Mass., Indiana Mun. Elec. Assoc. et al., the cities of Anaheim, Azusa, Banning and Colton, Cal., and Publicly Owned Systems.

Sandra J. Strebel, Spiegel & McDiarmid, Washington, D. C., for the cities of Anaheim, Azusa, Banning and Colton, Cal., and Publicly Owned Systems.

Charles F. Wheatley, Jr., Philip B. Malter, Wheatley & Wollesen, Washington, D. C., for American Public Gas Assn.

Thomas W. Pounds, United Gas Pipe Line Co., Houston, Tex., Irving Jacob Golub, Cecil W. Talley, C. Thomas Biddle, Jr., Houston, Tex., for petitioner United Gas Pipe Line Co.

William A. Major, Jr., Roy R. Robertson, Jr., Southern Natural Gas Co., Birmingham,

Ala., Charles J. McClees, Jr., Houston, Tex., for Intervenor Southern Natural Gas Co.

Michael R. Waller, Vice President and Gen. Counsel, Douglas Corbett, Tennessee Gas Pipeline Co., Houston, Tex., Dale A. Wright, Michael J. McDanold, Littman, Richter, Wright & Talisman, P.C., James J. McDanold, Washington, D. C., for Intervenor Tennessee Gas Pipeline Co., a Division of Tenneco Inc.

Brian E. O'Neill, Senior Vice President and Gen. Counsel, Transcontinental Gas Pipe Line Corp., Houston, Tex., Thomas F. Ryan, Jr., Joseph A. Cannon, Andrews, Kurth, Campbell & Jones, Robert G. Hardy, Washington, D. C., for petitioner Transcontinental Gas Pipe Line Corp.

William W. Brackett, Daniel F. Collins, Brackett & Collins, P.C., Charles V. Shannon, Washington, D. C., for Michigan Wisconsin Pipe Line Co.

Tom Burton, Carolyn S. Hazel, Houston, Tex., for Continental Oil Co.

John L. Williford, Larry Pain, C. J. Roberts, Bartlesville, Okl., for Phillips Petroleum Co.

Lauren Eaton, A. Paul Brandimarte, Jr., Lawrence E. Glenn, Robert W. Fuller, Jeffrey G. Shrader, Houston, Tex., for Gulf Oil Corp.

Arthur S. Berner, Houston, Tex., for Inexco Oil Co.

Michael B. Silva, Phyllis Rainey, Houston, Tex., for Tenneco Oil Co.

Charles J. Holland, Jr., Becky A. McGee, James D. Olsen, Thomas Deal, Dallas, Tex., for Sun Oil Co.

Baker & Botts, Houston, Tex., for petitioner United Gas Pipeline Co.

Martin N. Erck, C. Roger Hoffman, Douglas Rasch, Houston, Tex., for Exxon Corp.

Gordon Gooch, Charles M. Darling, IV, Charles E. Suffling, Washington, D. C., for General American Oil Co. of Tex., Pennzoil Producing Co., Pennzoil Oil & Gas, Inc., Pennzoil Louisiana and Texas Offshore, Inc., Pogo Producing Co. and Tenneco Oil Co.

Jere G. Hayes, Robert C. Murray, Dallas, Tex., for General American Oil Co. of Texas, Pennzoil Producing Co., Pennzoil Oil & Gas, Inc., Pennzoil Louisiana and Texas Offshore, Inc. and Pogo Producing Co.

Patricia A. Curran, Julie Langdon, Houston, Tex., for Pennzoil Co., Pennzoil Producing Co., Pennzoil Oil & Gas, Inc., Pennzoil Louisiana and Texas Offshore, Inc. and Pogo Producing Co.

Edward J. Kremer, Albert D. Hoppe, Dallas, Tex., for Arco Oil and Gas Co. Division of Atlantic Richfield Co.

Neal Powers, Jr., Rosemarie Morse, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for Cockrell Oil Corp.

Herman E. Garner, Jr., Houston, Tex., for Conoco Inc.

Robert D. Haworth, Letitia Z. Taitte, Charles J. McClees, Jr., Houston, Tex., for Mobil Oil Corp., Mobil Producing Texas and New Mexico, Inc., Mobil Oil Exploration and Producing Southeast Inc., Northern Natural Gas Producing Co.

Karen A. Berndt, Ralph J. Pearson, Jr., Robert P. Thibault, John A. Ramsey, Houston, Tex., Paul J. Broyles, for Texaco Inc.

Kenneth L. Riedman, Jr., Lois Ellen Gold, Los Angeles, Cal., Victor E. Fitzmaurice, Washington, D. C., for Union Oil Co. of California.

Robert R. Nordhaus, Gen. Counsel, Jerome Nelson, Sol., J. Paul Douglas, Jane C. Murphy, Atty., Washington, D. C., for respondent Federal Energy Regulatory Commission.

Before HENDERSON and SAM D. JOHNSON, Circuit Judges, and MAHON,** District Judge.

** District Judge of the Northern District of Texas, sitting by designation.

HENDERSON, Circuit Judge:

This appeal is from a series of orders[1] issued by the Federal Energy Regulatory Commission (hereinafter referred to as the "Commission") announcing changes in the regulations[2] dealing with interest on refunds required to be made by regulated companies[3] to their customers.

All rates and charges made in connection with natural gas sales within the Commission's[4] jurisdiction must be just and reasonable. Natural Gas Act (hereinafter referred to as "N.G.A.") § 4(a), 15 U.S.C.A. § 717c(a). Absent Commission approval a company may not change its rates until it has given the Commission and the public thirty days notice. N.G.A. § 4(d), 15 U.S. C.A. § 717c(d). Thereafter, the Commission may suspend operation of the new schedule for up to five months while it investigates the lawfulness of the rates. N.G.A. § 4(e), 15 U.S.C.A. § 717c(e). If the investigation is not completed by the end of the suspension period, the filing company may then collect the new charges, but if the Commission subsequently finds that the proposed rate exceeds what it determines to be just and reasonable, it can order the "company to refund, *with interest*, the portion of such increased rates ... found not justified." *Id.* (emphasis supplied). The N.G.A. does not specify the applicable interest rate, nor does it provide a method of computation. Instead, Congress left to the Commission the task of developing policies on this and other matters. N.G.A. § 16, 15 U.S.C.A. § 717o.[5]

In this appeal[6] the petitioners challenge the Commission's newest regulations, which were announced September 10, 1979, in Order No. 47 and became effective October 1, 1979.[7] Under this more recent order when a company is required to refund charges found to be greater than warranted, it must pay interest on the refund "at an average prime rate for each calendar quarter on all excessive rates or charges held on or after October 1, 1979."[8] Moreover, interest on

---

1. Nos. 47 (Sept. 10, 1979), 47–A (Nov. 8, 1979) and 47–B (Dec. 26, 1979), all in Docket No. RM77–22.

2. 18 C.F.R. §§ 154.67 and .102.

3. The new regulations apply to electric utilities over which the Commission has jurisdiction, *see* 16 U.S.C.A. § 824d (the Federal Power Act), and natural gas pipelines and producers whose gas is sold in interstate commerce, *see Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). The Commission postponed a decision on the rates to be paid by oil pipelines. Order No. 47 at 22–23.

    No electric utility has challenged the new regulations, so we are not concerned with the Federal Power Act.

4. The Federal Energy Regulatory Commission assumed most of the duties of the Federal Power Commission on October 1, 1977. In this opinion the term "Commission" refers to one or the other agency according to the date of action discussed.

5. The history of the Commission's treatment of N.G.A. § 4(e) interest is recounted in *American Public Gas Ass'n v. FPC*, 546 F.2d 983, 985–86 (D.C.Cir.1976), and in the Commission's Notice of Proposed Rulemaking in this Docket, at 3–6.

6. Petitions filed in other circuit courts of appeals have been transferred to this circuit and consolidated for our review.

7. The proceedings began on June 24, 1977, when nineteen electric utilities asked the Commission to reduce the rate of interest on refunds from nine to seven percent per year. On September 16, 1977, the Commission published notice of the proposal and invited public comment. Numerous parties, among them natural gas pipelines, gas producers and publicly and privately owned electric utilities, petitioned to intervene.

    On February 5, 1979, the American Public Power Association, which is made up of utilities that purchase electricity at wholesale prices (and thus may from time to time receive refunds), asked the Commission to raise the interest rate, contending that they could not borrow money except at rates above nine percent. They suggested that interest be tied to the prime rate. On March 9, 1979, the Commission gave notice that it proposed to amend its regulations "to tie the interest rate on ... refunds to the prime rate charged by commercial banks for short term business loans [and to] require monthly compounding of interest on funds held subject to refund ...."

8. Order No. 47 also provided a mechanism for computing the "average prime rate." Order No. 47–B amended the new regulations to include alternate sources of prime rate data.

amounts held on or after October 1, 1979, may be compounded quarterly.[9] The Commission made several other changes not here in dispute and deferred resolution of still other issues.

■ Before reaching the petitioners' objections, it is well to emphasize the limited scope of our review. When Congress decided regulation was necessary, it "entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts." *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312, 336 (1968). The Commission has reached what seems to us to be an eminently reasonable solution to what everyone agrees is a difficult problem. But even if we thought otherwise, we would not be free to interfere with the Commission's judgment unless its "action was 'arbitrary, capricious, or an abuse of discretion....'" *Superior Oil Co. v. FERC*, 563 F.2d 191, 201 (5th Cir. 1977) (quoting 5 U.S.C.A. § 706(2)(A)); *accord, Florida Power & Light v. FERC*, 598 F.2d 370, 379 (5th Cir. 1979); *American Public Gas Ass'n. v. FPC*, 546 F.2d 983, 987 (D.C.Cir.1976).

With this admonition in mind, we proceed to examine the new regulations. When the Commission first proposed to tie section 4(e) interest payments to the prime rate, it announced that the rate or rates chosen would have to (1) provide just compensation to consumers temporarily deprived of their funds by excessive charges, (2) reflect the benefit inuring to the companies from the use of those funds pending Commission review of their proposed rate schedules, and (3) avoid giving anyone—seller or consumer—an incentive to prolong the ratemaking proceedings. The objections raised by the petitioners can be broadly grouped as challenging either the propriety of these aims, specifically the first, or the Commission's resolution of conflicts among the goals. Our remaining task is to demonstrate that these are appropriate objectives, that the Commission acted reasonably in arbitrating the competing interests of the participants, and that it adequately explained and justified its conclusions.

■ The protesting petitioners are interstate pipelines and natural gas producers. Their positions on appeal are not identical in all respects, but the central contention of all is that the new regulations were designed to discourage the exercise of their statutory right to seek higher rates. All the petitioners vigorously press this argument. The Commission and the consumer intervenors are just as resolute in their response. The clash is enlightening. We agree with the Commission that the "argument is based on the mistaken premise that Section 4 of the Natural Gas Act grants companies an unrestricted right to make rate increase filings."

■ The N.G.A. declares it "unlawful" for a company to demand an unreasonable rate. Section 4(a), 15 U.S.C.A. § 717c(a). Any appearance of merit in the petitioners' stance dissipates when we recall that interest runs only on charges "found not justified." N.G.A. § 4(e), 15 U.S.C.A. § 717c(e). We appreciate the dilemma of a gas company in filing for all it feels it is due, since the Commission cannot approve more than is requested, N.G.A. § 5(a), 15 U.S.C.A. § 717d(a), and then being forced into making collections subject to refund because the Commission generally cannot grant retroactive increases, even to levels that would have been reasonable, *Gillring Oil Co. v. FERC*, 566 F.2d 1323, 1325 (5th Cir.), *cert. denied*, 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978); *but see Placid Oil Co. v. FPC*, 483 F.2d 880, 911–12 (5th Cir. 1973), *aff'd sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). *See Arkansas Louisiana Gas Co. v. Hall*, —— U.S. ——, ——, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). Nor is it the petitioners' fault that rate review often consumes a great deal of time, despite the congressional directive that such review be given preference over other pending mat-

---

9. Order No. 47–A modified Order No. 47 to the extent necessary to make clear that compounding was to begin on October 1, 1979, regardless of when the base interest accumulated.

ters, N.G.A. § 4(e), 15 U.S.C.A. § 717c(e), thereby leaving the filing parties with the burden of holding substantial balances for prolonged time periods, *see* Order at 4. Finally, we realize that the latitude allowed the Commission in arriving at "just and reasonable" rates, *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and the deference shown by reviewing courts, *id.; FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); N.G.A. § 19(b), 15 U.S.C.A. § 717r(b), make it difficult for producers and pipelines to predict the eventual outcome. But none of this changes anything. In the end a maximum lawful price is set, as intended by Congress. The Commission's determinations of just and reasonable rates are subject to judicial review in appropriate proceedings. N.G.A. § 19(b), 15 U.S.C.A. § 717r(b). This determination of a fair rate precedes any refund order, and is our starting point. We need not concern ourselves with what is a reasonable rate, but only with the remedy for unreasonable rates.[10]

■ We first consider whether it was appropriate to adopt a self-adjusting interest rate, set by reference to the prime rate charged by commercial banks.[11] All the petitioners urge that interest should not be computed on the full amount refunded, but the producer petitioners assert that, whatever the base, they should be permitted to pay a lower rate of interest—specifically "a floating interest rate equal to the average yield on three to five year U.S. Treasury Notes." This special treatment is justified, they suggest, because they can obtain favorable credit terms. Determining what

type of business loan is most analogous to the collection of rates subject to refund is a difficult undertaking, and as the Commission repeatedly noted, any resolution was likely to leave unsatisfied most all complaints. It is enough to say that, despite vigorous and worthy advocacy, the petitioners have failed to convince us of any error committed by the Commission. *See FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333, 345 (1944). At this point it is appropriate to note that not only is the specific comparison to loans for the most credit-worthy borrowers a strained one, but any analogy to commercial loans may cause misperceptions. There is no suggestion that energy consumers, who ultimately pay the excessive charges, would jump at the opportunity to lend money to oil companies, and, in any case they never have that choice. Our problem in this case is not with loans. Instead, we deal with the actions of the Commission in rectifying the consequences of unlawful behavior. This notion is fortified by the recollection that one of the main reasons Congress enacted the N.G.A., including the section 4(e) interest provision, was to protect consumers from these "borrowers." *FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 154–55, 83 S.Ct. 211, 216, 9 L.Ed.2d 199, 206 (1962) (Commission must cause the payment of refunds to be made "at the earliest possible moment consistent with due process."); *Atlantic Refining Co. v. PSC of New York*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312, 1319 (1959) ("The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges.").

---

**10.** Several petitioners insist that the Commission has set a "punitive" rate of interest. The orders do not evidence any purpose to restrict the exercise of congressionally granted procedural rights. We are not sure what the petitioners feel they would gain by showing that these regulations are "punitive." The Commission did not create the sanction of interest—Congress did. Congress also declared that excessive charges are "unlawful," and while the meaning of that word varies with its context, if the issues before us are to be understood, we must constantly bear in mind that we are dealing with unlawful charges.

**11.** We note that this is not the first time that the rate of interest on government-ordered refunds has been geared to the prime rate. *See, e. g.*, 26 U.S.C.A. § 6621 (1981 Supp.) (90% of prime on income tax over-/under-payments); 46 U.S.C.A. § 845(c)(2) (1981 Supp.) (Federal Maritime Commission refunds). Moreover, several appellate courts, including this circuit, have approved Commission regulations setting fixed interest rates greatly in excess of the prime. *See, e. g., Continental Oil Co. v. FPC*, 378 F.2d 510, 522 (5th Cir. 1967), *cert. denied*, 391 U.S. 917, 918, 919, 88 S.Ct. 1801, 1802, 20 L.Ed.2d 655, 656 (1968).

■ The second major attack focuses on the Commission's decision to require the payment of interest on the entire amount of a refund instead of just that portion retained by a company. The petitioners note that because they lose part of their receipts to federal tax obligations, they do not have use of all monies subject to refund, and, consequently, when they are forced to pay interest on the full amount of overcollection, they face an effective interest rate greatly in excess of the prime.[12]

The problem arises because the Treasury has the use of part of the collection while the Commission decides whether the rates are reasonable.[13] A question arises as to who should pay the time-cost of that money while the Commission makes its decision—the filing company or its customers?

It follows from what was said before that the burden should be on the company.[14] When a gas company accepts money subject to refund it becomes a stakeholder, and the Commission then determines who owns the stakes. Interest can be required only when it is determined that the money belongs to the consumers. As between passive consumers and active sellers, there seems to be no reason to place this burden on the eventual user, so the Commission's decision in that respect is certainly reasonable. While the result we reach does not depend on it, we agree with the Commission's conclusion

that gas companies can avoid this expense by acting prudently in submitting rate requests. We reject the petitioners' suggestion that this is an inappropriate consideration. On the contrary, Congress proscribed even a demand for unreasonable prices, and the return a company earns on unreasonable charges, albeit collected by permission of Congress, cannot control the rate of interest to be paid to consumers.[15]

■ Not only was it necessary for the Commission to make a finding on the tax question, it was also required to articulate its reasons in such detail that we can scrutinize its logic. *FPC v. Texaco, Inc.*, 417 U.S. 380, 395–96, 94 S.Ct. 2315, 2325, 41 L.Ed.2d 141, 155 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947); *Mitchell Energy Corp. v. FERC*, 651 F.2d 414, at 417–418 (5th Cir. 1981). *But cf. Bowman v. Arkansas-Best Freight*, 419 U.S. 281–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456 (1974) (enough that rationale can be "discerned"). The drafters of the new regulations understood the petitioners' objections and satisfactorily explained their study of the problem.

Early on, in a summary of the comments submitted in response to the proposed amendments, Order No. 47 noted that "Several sellers pointed out that revenues re-

---

12. As an example to clarify this argument, assume that a pipeline collects $1,000.00 subject to refund on January 1st, and pays $500.00 in income tax on that amount (the Commission made no findings on the effective marginal tax rates of pipelines). Then the pipeline invests the remaining $500.00 and earns the prime rate on its investment. Later, at the end of the year, the Commission orders a refund of the entire $1,000.00, together with interest at the prime rate. The pipeline will have earned only half of the interest it is required to pay to its customers.

It is true that the refund is tax deductible, and the petitioners do not suggest that the tax effect of this deduction will fail to offset that of the earlier income. See note 16, *infra*. Nonetheless, the pipeline has not had use of the funds for the year.

13. The Order notes that resolution of rate disputes often takes years. In fact, for large pipelines that make numerous filings, sums of mon-

ey held subject to refund amount to a permanent source of funds.

14. The Commission's approach is also consistent with the language of the Act, and the point now advanced is not even mentioned in court opinions reviewing earlier versions of the regulations or their application.

15. The producer petitioners assert they will be peculiarly injured if interest is required on the full refund rather than the net funds available to them. They observe that their receipts are reduced by royalty payments to owners as well as by tax payments. This difference does not demand special treatment. Only excessive collections need be refunded, and the events occurring between collection and refund are not controlling. If royalties create unique problems, producers can make arrangements with the owners or request specific relief from the Commission, *see Estate of French v. FERC*, 603 F.2d 1158 (5th Cir. 1979).

ceived subject to refund are subject to Federal income taxes. As a result, the money actually available to a company because of overpayments is reduced by approximately 50 percent. It was argued that any rate on refunds imposed by the Commission should apply only to those refunds actually available for use after taxes." Order at 5. The Commission agreed that tax payments have the described effect,[16] *id.* at 10, and considered the matter in developing the compromise rate finally selected.

It was clear from the beginning of these proceedings that no solution would satisfy everyone. The innovative approach the Commission adopted has much to recommend it, and is surely not unreasonable. Choices had to be made, and the Commission went about its task in an acceptable manner. It had to deal with objections from all sides. The several orders discuss literally dozens of discreet policy considerations that went into the final regulations. The Commission demonstrated an appreciation of the petitioners' tax situation, and, as stated earlier, those circumstances do not invalidate the regulations.

▮ Finally, we direct brief attention [17] to the Commission's decision to require compounding of interest. The petitioners do not urge the unfairness of compounding interest, but assert that it constitutes a radical departure from past practice. Be this as it may, compounding is also reasonable and the orders furnish a satisfactory explanation. If there was any failure of articulation or substantive unfairness it was in prior orders that failed to consider the issue.

**16.** Several petitioners note the statement, contained in a footnote, that the tax effect of collection would eventually be offset by deduction of the refund, Order No. 47 at 10 n.1, and imply it is evidence of a fundamental misunderstanding of their position. It is true the deduction of refunds does not change the fact that the government had use of part of the refund during the period between collection and refund, but the footnote does not say otherwise. It relates to an entirely different concern—the possibility that the company might permanently lose part of the overcollection to the tax collector.

For the foregoing reasons, the orders of the Commission are

AFFIRMED.

**17.** We have given careful consideration to all of the arguments marshalled against the amendments. In this opinion we have reviewed all that are substantial. Because the matters are given prominence in certain of the petitioners' briefs, we note that the Commission has not impermissibly abandoned any longstanding policy of recognizing the tax aspects of refunds, and that the distinctions between the issues we now confront and those involved in the regulation of purchased gas cost adjustment accounts, *see* 18 C.F.R. § 154.38(d)(4), justify a different regulatory attitude.

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.