**AMOCO PRODUCTION COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 83–3146.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1985.

Decided May 17, 1985.

* Hon. John W. Peck of the Sixth Circuit, sitting

J. Paul Douglas, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., for petitioner.

Joshua Z. Rokach, F.E.R.C., Washington, D.C., for respondent.

Before BAUER and POSNER, Circuit Judges, and PECK, Senior Circuit Judge.*

POSNER, Circuit Judge.

Amoco Production Company, a producer of natural gas, seeks review of orders of the Federal Energy Regulatory Commission (formerly the Federal Power Commission) requiring it to pay interest at what Amoco contends is too high a rate on money that the Commission ordered Amoco to refund to its customers. The Commission is empowered to order the refund of money

by designation.

collected by producers of natural gas sold in interstate commerce under rates that exceed ceilings fixed by the Commission. See Natural Gas Act, § 4(e), 15 U.S.C. § 717c(e); Natural Gas Policy Act of 1978, § 601(b)(1), 15 U.S.C. § 3431(b)(1).

In the 1960s, the Commission, having found it quite impracticable to fix rates for the thousands of producers on an individual basis, turned to area rates, and in 1971 it entered into a settlement with various producers, including Amoco, fixing the maximum rates that could be charged for gas produced in Southern Louisiana. This settlement is found in the Federal Power Commission's Opinion No. 598, 46 F.P.C. 86 (1971), aff'd under the name of *Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir.1973), aff'd under the name of *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). The rates allowed by the settlement varied from 21 to 26 cents per thousand cubic feet of gas. (For general background see *Public Service Comm'n v. Mid-Louisiana Gas Co.,* — U.S. ——, 103 S.Ct. 3024, 3029–31, 77 L.Ed.2d 668 (1983); *FERC v. Triton Oil & Gas Corp.,* 712 F.2d 1450, 1453–54 (D.C. Cir.1983).)

Louisiana and the federal government disagreed over which of them owned some offshore gas fields covered by the settlement. If Louisiana owned the fields, it was entitled to levy its severance tax on gas produced from them. Under section 9.1 of the settlement, 46 F.P.C. at 163–64, the producers were to collect the tax in their rates, but could retain the proceeds until the dispute was settled. If refund became necessary because the federal government rather than Louisiana turned out to be the owner, the producers would refund the money they had collected, with simple interest at 7 percent; otherwise the producers would hand over the tax receipts, with no interest, to Louisiana.

Seven percent was the interest rate the Commission had fixed for refunds generally back in 1960. See Order No. 215–A, 23 F.P.C. 474 (1960). In 1974 the Commission raised the rate to 9 percent. See Order No.

513, 52 F.P.C. 920 (1974), modified under the name of *American Public Gas Ass'n v. FPC*, 546 F.2d 983, 988–89 (D.C.Cir.1976); Order No. 513–A, 56 F.P.C. 289 (1976), aff'd under the name of *Northern Illinois Gas Co. v. FERC*, 575 F.2d 920 (D.C.Cir. 1978) (per curiam). In 1979, in Order No. 47, the Commission adopted a floating rate (the prime rate, compounded). See *United Gas Pipe Line Co. v. FERC*, 657 F.2d 790 (5th Cir.1981); see also 44 Fed.Reg. 53493 (Sept. 14, 1979); 18 C.F.R. § 154.102(c).

Meanwhile, as a result of skyrocketing oil prices beginning in 1974, which pulled up the prices of substitute fuels such as natural gas, the rates fixed in Opinion No. 598 turned out to be unrealistic and the producers were allowed to raise them. By 1982 some Southern Louisiana gas was being sold for as much as $1.44 per thousand cubic feet—almost seven times the amount that had been fixed in the settlement.

The gas in question in this case is Southern Louisiana gas produced and sold by Amoco between 1971 and 1982, when—the dispute between Louisiana and the federal government having finally been resolved by the Supreme Court—the Commission ordered Amoco to refund the money it had collected for Louisiana severance taxes on gas produced in the disputed zone, with simple interest at 7 percent before 1974, simple interest at 9 percent between 1974 and 1979, and compound interest at the prime rate since then. Of course Amoco does not quarrel with the 7 percent figure; it merely argues that that figure is applicable throughout the entire period—that the 1971 settlement, embodied in Opinion No. 598, was meant to fix for all times the interest rate on refunds of revenues from gas produced in the disputed zone. If Amoco is right, the Commission has ordered it to refund about $4 million more than is lawful.

As an original matter, the company's position would have very little to commend it. Amoco reads too much into the settlement. It claims that the settlement fixed its interest obligations for all time; but it would be horrified to think that the settlement had

fixed its gas prices for all time. Amoco was more than willing to accept a modification of the price provisions of the settlement to allow it to sell at prices much higher than those fixed in the settlement, but sees no contradiction in insisting that the equally unrealistic interest rate fixed in the settlement is sacrosanct. Yet the same forces that made the prices unrealistic to producers made the interest rate unrealistic to consumers; the inflationary pressures that, in conjunction with the extraordinary increase in the price of oil that was itself a cause of the inflation, pushed up the price of natural gas also pushed up interest rates. Amoco should not have thought it could appeal to inflation to relax the price ceiling in the settlement, but keep the interest ceiling intact against adjustment based on the same inflation.

The lack of symmetry in Amoco's position is more than an aesthetic flaw. The Commission's relaxation of the price limits in Opinion No. 598 has enabled Amoco to charge prices to the consumer that more than reflect the general rate of inflation (the price level is not seven times higher than it was in 1971, thank goodness). At the same time Amoco has been borrowing money from the consumer at the deliciously low interest rate of 7 percent by collecting taxes nominally for Louisiana and then keeping and investing the tax moneys until the dispute between Louisiana and the federal government was settled. Amoco will keep all the interest it has made on this borrowed money above whatever rate the Commission determines; and if that rate is 7 percent, it will mean that Amoco has profited very handsomely, and at zero risk, from the forced loan from its customers. The money was their money, but if Amoco's argument is accepted they have been deprived of the opportunity to protect themselves from inflation by investing their money at market rates of interest. If Louisiana had prevailed, Amoco would have been even better off. It would have had to pay the tax moneys to Louisiana instead of to its consumers, but it would have kept all the interest it had earned on

the money; it would not have had to pay even ·7 percent.

True, Amoco had to pay income tax on the revenues it eventually refunded; and though it got to deduct the refunds from its taxable income in the year when they were made, still the amount of the forced loan from consumers that it actually received was less than the face amount, as it were, of the "loan." But all this shows is that the windfall was not so large as it might have been. It was still a windfall; and one purpose of the Commission's successive increases in interest rates on refunds is to prevent such windfalls, while another is to protect consumers (whose loss of the use of their money, we have just seen, was greater than Amoco's gain). See, e.g., *United Gas Pipe Line Co. v. FERC, supra,* 657 F.2d at 795; cf. *United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 230, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965). Therefore, the better interpretation of the settlement is that if the producers were allowed to charge higher rates than provided in it, the Commission would be allowed to fix a higher interest rate on refunds than the rates specified in it; if the producers got price relief because of inflation, the consumers would get interest-rate relief because of the same inflation, which pushed up interest rates along with (other) prices.

The higher interest rate would have to be reasonable. But there is no suggestion that the interest rates that the Commission has fixed by general order are either too high in general (they have been upheld on judicial review against such a challenge, as we have seen), or oppressive to Amoco in particular, or that the Commission singled out Amoco for these higher rates. All it did was apply its general interest-rate orders to the other Southern Louisiana producers, which include Amoco.

There is no evidence that Amoco or other producers bargained in the 1971 order for a 7 percent interest rate by making some concession to the Commission. Cf. *Northern Ill. Gas Co. v. FERC, supra,* 575 F.2d at 921. That happened to be the Commis-

sion's standard interest rate at the time, a rate of long standing. Of course, this being so, one can argue that there must have been a reason for writing the 7 percent rate into the provision of the settlement that dealt with the disputed zone. However, contracting parties, fearful of leaving things to chance, often write into their contracts unnecessary provisions. We must ask whether it makes sense to assume that the Commission committed itself to maintaining the same interest rate till the gas ran out, even if the producers were allowed to raise prices very steeply. It makes no sense.

If Amoco thought the contract so ambiguous that a hearing should be held to explore the negotiations that led up to the 1971 settlement, it should have asked for such a hearing; it did not. Yet it says in its reply brief to us, "The language of section 9.1 of the Settlement Agreement contains a built-in ambiguity; the parties did not contemplate subsequent national rate orders and federal legislation." We agree—and are baffled by Amoco's statement on the same page that "the language of the agreement plainly indicates that the parties to the settlement agreement intended to resolve the question of refunds from the Disputed Zone *for all time*." (Emphasis added.)

All that gives us pause is that the Commission's explanation for imposing the higher interest rates was so cryptic. Initially it just said that the 1971 settlement did not govern sales of gas at rates different from those fixed in the settlement and that it had to follow its generally applicable regulations on interest in the absence of some reason for departing from them, and there was no reason. This explanation was lengthened but not elaborated in an order denying rehearing. The Commission never explained whether it was interpreting the settlement, or modifying it, or holding that it had been superseded by the Commission's general interest-rate increases or that it would be unconscionable for Amoco to enjoy the benefit of higher gas prices than it had agreed to in the settlement without bearing the burden of a higher interest rate. Thus the discussion in the preceding paragraphs of this opinion may be thought an extreme form of reading between the lines.

But this is a case where the path that the administrative agency has taken can be discerned without guideposts. Cf. *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945); *Sellersburg Stone Co. v. Federal Mine Safety & Health Review Comm'n*, 736 F.2d 1147, 1150 (7th Cir.1984); *Benmar Transport & Leasing Corp. v. ICC*, 623 F.2d 740, 746 (2d Cir.1980). A company has to have a reason for wanting to be excused from paying interest for the use of other people's money at the generally applicable interest rates. The company points to the 1971 settlement as a reason, but, as the Commission too tersely observed, it is no reason. The settlement fixed prices for natural gas, but the natural gas in issue in this case was sold at much higher prices. The interest rate in the settlement cannot logically or equitably be separated from the prices in the settlement. Indeed, the settlement ties them together; the section on which Amoco relies expressly applies the rates fixed in the settlement to sales of gas from the disputed zone. 46 F.P.C. at 164. Either the settlement did not mean to freeze the interest rate, or Amoco is estopped to enforce the freeze, having been allowed to charge higher prices than the settlement allowed. It would be nice if the Commission had spelled all this out but it is all too obvious to make a remand more than an exercise in perfectionism. Cf. *Illinois v. ICC*, 722 F.2d 1341, 1348–49 (7th Cir.1983), and cases cited there. Indeed, in light of cases such as *Shell Oil Co. v. FERC*, 664 F.2d 79, 82–84 (5th Cir.1981), the Commission's failure to apply its general regulations on interest rates to the gas involved in this case might well have been thought arbitrary and capricious, for such a failure could only confer a windfall on producers, and there is as we have said no evidence that Amoco bargained for such a benefit. See also *American Public Gas Ass'n v. FPC, supra*, 546 F.2d at 987–89.

Amoco presses on us the District of Columbia Circuit's recent decision in *FERC v. Triton Oil & Gas Corp.*, 750 F.2d 113 (D.C.Cir.1984), which held that the Commission, in trying to impose its current interest rate on sales from Southern Louisiana, had failed to give an adequate reason for departing from the 7 percent rate fixed in that opinion. The court pointed out that in Order No. 47, which set the current interest rate (the floating prime), the Commission had said that the new rate would "not apply where a different stipulated rate of interest has been established ... by a Commission order approving a settlement agreement...." 750 F.2d at 115. That sounds like this case but actually is unrelated. The gas at issue in *Triton* had been sold before 1971, at rates subject to the 1971 settlement. As to that gas, sold at those rates, Triton had not been the beneficiary of subsequent modifications of the settlement. The Commission's only reason for trying to assess a higher interest rate against Triton was that Triton had dragged its heels in making refunds, a reason the court rejected because the delay had been due solely to Triton's exercising its right of judicial review of the Commission's refund order. There is nothing like that in this case. The Commission *has* applied the 7 percent rate to amounts that Amoco collected before the rate was raised in 1974; it has done what *Triton* says it must do.

AFFIRMED.