**EAST TENNESSEE NATURAL GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 81–3142.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 26, 1982.

Decided Aug. 25, 1982.

Dale A. Wright, James T. McManus, James R. Schroll, Washington, D. C., Thomas E. Midyett, Knoxville, Tenn., for petitioner.

Joseph S. Davies, Federal Energy Regulatory Comm., Washington, D. C., for respondent.

Jack M. Irion, Bomar, Shofner, Bomar & Irion, Shelbyville, Tenn., for intervenor-East Tennessee Group.

Before ENGEL and KENNEDY, Circuit Judges, and HILLMAN,\* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

In this case petitioner East Tennessee Natural Gas Company asks us to review Federal Energy Regulatory Commission (FERC or Commission) Opinion No. 106, CCH Util.L.Rep. ¶ 12,396 (December 17, 1980), in which the Commission established petitioner's allowed rate of return on common equity. Petitioner asks us to find that the rate set is not within the zone of reasonableness and cannot be justified on the record before us.

East Tennessee is a small interstate natural gas pipeline company located in Tennessee, serving customers in Tennessee and Virginia. Petitioner is subject to FERC regulation under the Natural Gas Act, 15 U.S.C. § 717 *et seq.* In October, 1977 petitioner filed an application with the Commis-

\* Honorable Douglas W. Hillman, United States District Court for the Western District of Michigan, sitting by designation.

sion under section 4 of the Act for an increase in its wholesale rate. The Commission suspended the new rate for the statutory maximum five months, permitting the rate to take effect subject to refund on May 1, 1978.

Petitioner and the Commission staff entered into a settlement agreement, approved by the Commission on August 10, 1979, that resolved all but three issues concerning the new rate. The three issues reserved for hearing and decision by the Commission included the proper rate of depreciation for certain assets, the amount of long-term interest expense to be allocated to petitioner's pipeline business, and the proper rate of return on common equity. The first two issues were apparently resolved to petitioner's satisfaction before the Commission as they have not been appealed. The only issue before us is whether the Commission set an unreasonable rate of return on common equity.

Petitioner sought a 13.88 percent return on common equity for an overall rate of return of 12.14 percent.[1] The FERC staff proposed an 11.00 percent return on common equity and an overall rate of return of 9.98 percent. Evidentiary hearings were held before the Administrative Law Judge (ALJ) on August 29 and September 28, 1978.

The witnesses appearing at the hearing on behalf of the Commission staff and petitioner each used the "opportunity cost method" to support their respective proposed rates of return on equity. This is one of the methods the FERC uses to set a fair rate of return on equity for the companies it regulates. The opportunity cost method requires a determination of the rate of return investors could earn if they chose to invest in other enterprises that are comparable in terms of risk to an investment in petitioner's common stock. The method does not produce very objective results and permits substantial room for disagreement over both the relative importance of various risk factors and when unrelated investments are comparably risky.

The company witness testified that an investment in petitioner entails considerable risk because petitioner's supplies of natural gas are dwindling and there is increasing competition among natural gas pipeline companies for remaining natural gas supplies. The company witness asserted that because of these risks an investment in petitioner was comparable to an investment in certain high earning electric utilities and unregulated industries. The company witness also observed that the rate of return on equity must compensate investors for the risk of investing in petitioner rather than in safer investments such as bonds, and stated that continued high interest rates and inflation demanded a higher return on equity than might previously have been acceptable. Thus, the company witness concluded that a 13.88 percent return on common equity was justified.

The staff witness testified that other gas pipeline companies offer the most useful comparison with petitioner and that the rates of return on equity they are permitted to earn are the best starting point for determining a fair return on petitioner's equity. He contended that for several reasons petitioner was a less risky investment than is the average gas pipeline company. During the period 1972–1976 (the five years preceding petitioner's rate application) petitioner's earnings grew at an above average rate and it had a greater than average gas "sales life."[2] It had a below average need for externally generated capital (a lower need to attract capital implies that a lower return on capital will be reasonable) and a high ratio of common equity to debt (a high equity ratio increases the likelihood that in the event of dissolution there will be enough assets to repay equity investors, re-

---

1. The overall rate of return is the rate of return on the utility's total capitalization, debt plus equity. Thus, it includes a component for the interest expense of long-term debt as well as the return on equity.

2. "Sales life" is the number of years a pipeline company could continue to sell gas at the present rate given its present known supply of gas.

ducing the risk faced by those investors). Historically, petitioner had demonstrated above average earning on equity which, the staff witness testified, tended to reduce the future investment risk. The staff witness also recognized a couple of factors that increased the risk of investing in petitioner—it has only one source of gas supply (subjecting it to an increased risk of service interruptions) and is a growing firm, and so it faces an increased possibility of cost overruns, labor strikes, etc. However, on the whole the staff witness concluded that petitioner was a below average pipeline company investment risk and accordingly that an 11.0 percent rate of return on equity was reasonable.

The ALJ issued his decision on April 6, 1979. He recounted the testimony of both witnesses, then criticized the company witness for being overly preoccupied with petitioner's gas supply situation. Because concern for its gas supply weighed heavily in petitioner's justification of a 13.88 percent rate of return the ALJ discounted the company's conclusion as to a fair rate. The ALJ also rejected as unsubstantiated the company witness's comparison of petitioner with the higher earning electric utilities and unregulated industries. He agreed with the staff witness that petitioner was a below average pipeline company investment risk because of its high equity ratio, long sales life, high interest coverages and good earnings record. The ALJ therefore adopted staff's recommended 11.0 percent return on common equity. The 11.0 percent return, when applied to petitioner's actual capitalization as of April 30, 1978 (the end of a "test period" used in reaching the settlement agreement) produced an overall rate of return on petitioner's total rate base of 9.98 percent. The ALJ found this overall rate of return to be within the zone of reasonableness. As a check on the reasonableness of the allowed return on common

equity the ALJ compared the weighted return on equity petitioner would earn with the weighted return on equity earned by other gas pipeline companies and by the utilities and industries petitioner offered for comparison.[3] The ALJ found that an 11.0 percent return on equity would give petitioner an above average weighted return on equity, confirming his conclusion that the 11.0 percent rate of return was fair.

The Commission issued its final decision over one and one-half years later, on December 7, 1980. The Commission stated that the 11.0 percent return on equity set by the ALJ could only be justified if it were no riskier to invest in petitioner's common stock than long-term debt securities, as interest rates had been rising steadily since petitioner filed its rate and the proposed increase was not for a locked-in period (that is, the rate would continue to be effective indefinitely into the future, when it appeared interest rates would continue to be high). The Commission agreed with the ALJ that petitioner's witness was overly concerned with petitioner's gas supply and found that petitioner was a "not above average" pipeline company investment risk in most respects. The Commission noted that in fact petitioner was a "somewhat below average" risk because of its corporate affiliation with Tenneco, Inc.[4] The Commission also observed that petitioner had a relatively high equity ratio (either 56.6 percent or 70.1 percent, depending on which of two capitalization figures the Commission used).

After considering all of these factors and rates of return allowed other gas pipeline companies in recent cases the Commission concluded that the evidence did not support a finding that the risks associated with petitioner's common stock were similar to those of long-term bonds, and raised the rate of return on petitioner's April 30, 1978 capitalization from 11.0 to 11.5 percent, for

---

3. Weighted return on equity is the equity ratio times the return on equity, the component of the overall rate of return that is attributable to return on equity. For example, a company with an equity ratio of 60 percent earning a 10 percent return on equity would have a weight-

ed return on equity equal to $(.6) \times (.1)$, or 6 percent.

4. Tenneco owned 90 percent of petitioner's stock at the time of the Commission's decision.

an overall rate of return of 10.47 percent. However, the Commission also observed that this April 30, 1978 settlement capitalization was no longer representative of petitioner's capital structure. The settlement capitalization showed a ratio of 29.85 percent debt and 70.15 percent equity. In its opinion the Commission asserted that for a company in petitioner's circumstances common equity is simply the difference between total rate base and long-term debt. Applying this formula the Commission found petitioner's equity ratio to be 56.61 percent. The Commission stated that the 56.61 percent equity ratio was more representative of petitioner's actual capitalization than was the 70.15 percent ratio of the settlement capitalization. When applied to the lower equity ratio the 10.47 percent overall rate of return yielded a return on equity of 12.33 percent. The Commission found this return on equity to be within the zone of reasonableness.[5]

Petitioner sought rehearing of the Commission's decision on January 16, 1981. The petition for rehearing was denied by operation of law on February 16, 1981. On appeal petitioner argues that the Commission did not adequately consider the long-term upward trend in interest rates, improperly penalized petitioner for its affiliation with Tenneco and its high equity ratio, ignored the risk posed by petitioner's gas supply, and wrongly rejected petitioner's evidence on the rates of return earned by comparable investments.

■ Section 4 of the Natural Gas Act charges the Commission with ensuring that proposed rates are "just and reasonable." Under the Supreme Court's interpretation of this standard,

the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital.

*F. P. C. v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). In addition, the return must provide for the existing and foreseeable public interests. *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968).

However, it is well-established that "judicial review of the Commission's [now FERC] orders is extremely limited." *Mobil Oil Corp. v. F. P. C.*, 417 U.S. 283, 306, 94 S.Ct. 2328, 2344, 41 L.Ed.2d 72 (1974). As the Court quoted in *Mobil*:

"[W]e have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' *FPC v. Hope Natural Gas Co., supra* [320 U.S.] at 602 [64 S.Ct. at 287]. We are not obliged to examine each detail of the Commission's decision; if the 'total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.' *Ibid.*

---

**5.** The Commission showed some hesitancy to rely on the assertedly more representative capitalization, having approved the settlement capitalization as part of the settlement agreement. Petitioner argues that any reliance on the Commission's allegedly more accurate figure is "purely *ipse dixit.*" However, petitioner has made no suggestion that the Commission's capitalization is inaccurate, or that reliance on it is unlawful or inequitable. The Commission's approval of the settlement agreement does not appear to us to bind it for all purposes to the

capitalization figure contained therein. Specifically, it does not require the Commission to calculate the rate of return based on the settlement capitalization. If petitioner had an objection to the simple formula used by the Commission to find petitioner's equity ratio or to the result reached we can assume it would have been raised. Since no meaningful objection was raised we will regard the Commission's opinion as allowing a 12.33 percent return on common equity.

"Moreover, this Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585 [62 S.Ct. 736, 742, 86 L.Ed. 1037]. No other rule would be consonant with the broad responsibilities given to the Commission by Congress; . . ."

*Id.* at 307, 94 S.Ct. at 2345.

The Court defined the scope of judicial review further in the context of area rate regulation:

"First, [the reviewing court] must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. *The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.*" *Id.* [390 U.S.] at 791–792 [88 S.Ct. at 1373] (emphasis supplied).

Where application of these criteria discloses no infirmities in the Commission's order, the order cannot be said to produce an "arbitrary result," and must be sustained. *FPC v. Hope Natural Gas Co.*, 320 U.S. at 602 [64 S.Ct. at 287].

*Id.* at 307–308, 94 S.Ct. at 2345.

We conclude that under the Supreme Court's mandate, the court of appeals in a simple rate case such as we have here is restricted to a determination whether the end result of the rate proceedings is reasonable. If we are not convinced that the rate is unreasonable we have no power to set it aside. We must further emphasize that our review in this case is restricted to a determination whether the rate approved by the Commission's order was outside the zone of reasonableness at the time of its decision in December, 1980, not whether events since that time have demonstrated that it is unreasonable.

We have discussed the standard of review at some length because this is a case that turns on the standard of review. Although the Commission listed the factors it considered in choosing a 12.33 percent rate of return on equity, it made little attempt to show a relationship between these factors and either the rate chosen or the zone of rates it considered reasonable. Both the Commission and the ALJ simply asserted that the return each approved was within the zone of reasonableness without any explanation or attempt to define the zone. Were the burden on East Tennessee any less than it is, or were we free to examine the Commission's rationale as well as its result, we might well reach a different conclusion in this case.[6] This is so because we

---

6. In *Arkansas Louisiana Gas Co. v. F. E. R. C.*, 654 F.2d 435 (5th Cir. 1981), the Fifth Circuit recently remanded a rate order to the Commission because of the Commission's failure to explain rationally why it chose to place a lower limit of 12.0 percent on the zone of reasonableness in that case. The Fifth Circuit placed the burden on the Commission to define both the upper and lower limits of the zone of reasonableness. There is much merit to the Fifth Cir-

cuit's position. As we have struggled with this case we have come to appreciate the difficulty of saying with any degree of certainty that a given rate is or is not reasonable. Our expertise as a court is much more suited to determining whether an administrative agency has acted rationally, not whether the result it reached was reasonable, and the Fifth Circuit's opinion recognizes this fact. We regret that we cannot follow their analysis here, but in our opinion it

find it extremely difficult, if not impossible, to translate the simple concepts at play— "commensurate return," "corresponding risk," "rate of return sufficient to assure integrity and attract capital," "public interest"—into hard numbers. Under a lesser standard of review the Commission's failure to demonstrate better the reasonableness of its result might well prove fatal to that result. However, we are restricted to an end result analysis and the burden is on East Tennessee. For the reasons that follow we conclude that, although the 12.33 percent return on equity appears to us to be quite low and we cannot accept all of the Commission's reasoning in support of its conclusion, East Tennessee has not met its "heavy burden of making a convincing showing" that 12.33 percent is outside the zone of reasonableness on this record.

The Commission found that as a mature pipeline company petitioner had a low need for externally generated capital, and this finding is supported by substantial evidence. Because East Tennessee does not need to attract a great deal of capital it does not need a high rate of return. Substantial evidence also supports the Commission's finding that petitioner has historically been a very attractive, safe investment. Thus, a somewhat lower than average return on equity should still induce investors to invest in East Tennessee.

In addition to considering the interests and needs of the regulated utility, the Commission is charged with safeguarding the public interest. One of the reasons advanced by the Commission in support of granting a low return on common equity here is that petitioner's unusually high equity ratio has two adverse impacts on ratepayers: high cost equity replaces low cost debt; the utility must pay higher income taxes because the utility's interest deductions are reduced with a high equity ratio, thereby increasing the income tax component of its cost of service. These are legitimate factors that the Commission may con-

sider in setting a rate. Petitioner has not shown that these concerns are inapplicable here.

The rates of return approved for other gas pipeline companies are useful to some extent to show that the rate approved here is or is not reasonable. The range of rates of return for natural gas pipeline companies beginning in 1977 and continuing until the most recent decisions prior to this one in 1980 was 10.47 to 14.0 percent, with the majority between 12.0 and 14.0 percent. *Determination of Incentive Rate of Return, Tariff, and Related Issues*, Order No. 31, CCH Util.L.Rep. (Transfer Binder *Orders* 1974–1979) ¶ 15,713 at 6523 (June 8, 1979); *United Gas Pipeline Co.*, Opinion No. 99, CCH Util.L.Rep. ¶ 12,379 (October 10, 1980); *Arkansas Louisiana Gas Co.*, Opinion No. 71, CCH Util.L.Rep. ¶ 12,268 (January 11, 1980), *remanded, Arkansas Louisiana Natural Gas Co. v. F.E.R.C., supra; Consolidated Gas Supply Corp.*, Opinion No. 70, CCH Util.L.Rep. ¶ 12,263 (January 11, 1980), *aff'd, Consolidated Gas Supply Corp. v. F.E. R.C.*, 653 F.2d 129 (4th Cir. 1981); and *Kansas-Nebraska Natural Gas Co., Inc.*, Opinion No. 68, CCH Util.L.Rep. ¶ 12,250 (Nov. 9, 1979). In the latter cases any discussion of a zone of reasonable rates invariably centered on the 12–14 percent range. The approved rate of 12.33 percent is within these limits.

Although the approved rate falls within these formerly acceptable zones of reasonableness and the factors outlined *ante* suggest a below average rate of return is appropriate for East Tennessee, East Tennessee argues with a good deal of force that changed economic conditions over the past several years now make the 12.33 percent rate of return unreasonable. The thrust of petitioner's argument is that because of continued very high interest rates it is no longer permitted to earn a rate of return sufficient to attract capital or compensate investors for the risk of investing in it instead of some safer investment.

is inconsistent with the Supreme Court's command that the burden is on the party challenging a rate order to show that the rate is unreasonable, not on the Commission to show that

the rate is reasonable. *See Mobile Oil Corp. v. F. P. C.*, 417 U.S. 283, 307, 94 S.Ct. 2328, 2345, 41 L.Ed.2d 72 (1974).

Prevailing interest rates strongly influence the reasonableness of a return on equity since they represent the return earned by investments with which petitioner must compete for capital. The record shows that "A" rated public utility bonds yielded 8.61 percent during 1977, the year in which petitioner filed its new rate. They climbed to average 9.29 percent in 1978, the year in which the evidentiary hearings were held, and rose to 10.49 percent during 1979, the year of the ALJ's decision. They had risen to average more than 13.3 percent during 1980 by the time the Commission rendered its decision. Twenty-year United States Treasury bonds, considered by the Commission to be a "riskless" investment, yielded an average 7.67 percent in 1977, 9.33 percent in 1979, and 11.29 percent for January through November, 1980.

The Commission was well aware of the changes caused by increasing interest rates. These changes are the reason the Commission increased the return on equity from the 11.0 percent approved by the ALJ to 12.33 percent. For the reasons that follow we are not persuaded that as adjusted petitioner's rate of return was unreasonable in light of conditions at the time of the Commission's decision.

The rate approved by the Commission was to be effective retroactive to May, 1978. Interest rates for long-term "A" rated public utility bonds averaged 11.30 percent during the period May, 1978 to December, 1980. Thus, for this period petitioner was allowed a premium, to account for the increased risk of investing in it, of 1.03 percent above the yield of "A" rated utility bonds. For the period January, 1978 to November, 1980 twenty-year United States

Treasury bonds had an average yield of 9.66 percent so petitioner received a risk premium of 2.67 percent above the yield of riskless investments.[7] Petitioner points to no persuasive evidence in the record that a 12.33 percent rate of return does not provide a sufficient risk premium for the period from May, 1978 until the time of the Commission's decision, to permit it to attract capital or compensate investors for the risk associated with their investment. A rate of return adequate solely in light of the high 1980 interest rates would have overcompensated East Tennessee for the early part of the effective rate period, when interest rates were relatively low. We therefore conclude that East Tennessee has not established the rate of return allowed petitioner was unreasonable if we consider only the period through December, 1980.

We must then decide whether a rate of return of 12.33 percent becomes unreasonable when we consider that the rate was to be effective indefinitely after the Commission's decision. At the present time it is obvious to most that an investment in common equity yielding a return of only 12.33 percent during 1981 and 1982 was not likely to find many takers. However, we are loath on this record to hold that the Commission's failure to anticipate that interest rates would maintain their record levels of late 1980, and in fact rise even higher, places the 12.33 percent rate of return outside the zone of reasonableness. The record shows that although interest rates increased sharply during the latter part of 1979, they also fell quite sharply during the first part of 1980. In the latter half of 1980 they rose sharply again.[8] Thus, in December, 1980,

---

**7.** Based on Commission precedent East Tennessee would require the Commission to guarantee it a rate of return on equity at least five percent above the Treasury Bill rate. However, the Commission has never adopted the rigid approach to interest rates that petitioner proposes. Rather, its decisions recognize that there is no hard and fast rule, and that risk premium is only one factor to consider in setting a fair rate of return. See, e.g., Order No. 31, supra, at 6523–6527.

**8.** The dilemma facing the Commission is vividly demonstrated by this graph of interest rates on corporate bonds, "A" rated new utility bonds, and ten-year United States Treasury bonds during the effective rate period prior to the Commission's decision. The graph shows that as of December, 1980, almost any conclusion as to what the future would bring was as reasonable as any other. The graph was taken from *Illinois Power Co.*, 15 FERC ¶ 61,050 (April 10, 1981), and bears markings relevant to that case.

438

the Commission had to guess whether interest rates would take another plunge, in which case a 12.33 percent rate of return was perfectly acceptable, or would remain high. The Commission guessed wrong, as it turned out, but its wrong guess was not unreasonable given the facts before it.[9]

East Tennessee has raised several other claimed grounds for reversal. It challenges the Commission's refusal to consider studies by East Tennessee's expert witness showing the rates of return on equity earned by companies in other fields. The Commission rejected the evidence because an inadequate showing was made that the other companies were comparable to petitioner. We do not sit to review the Commission's decision of what evidence to credit.

■ Petitioner also challenges the Commission's classification of it as a below average pipeline company investment risk solely

CHART I

SELECTED INTEREST RATES: MARCH 1978 – FEBRUARY 1981

Sources: Board of Governors of the Federal Reserve System, Federal Reserve statistical releases, Series G.13 (415), Issues from April 1978 through March 1981; Federal Reserve Bulletins, Washington, D. C.  20551, Various issues from July 1978 through March 1981, Series A25 and A27.

9. Since its decision in the instant case the Commission has recognized that the rapidly changing economic conditions require new methods of regulation. In *Illinois Power Co.*, 15 FERC ¶ 61,050 (April 10, 1981), the Commission took the novel step of granting a two-part rate increase: a first rate covering the historical period from the time the rate was filed until the Commission's decision, and a second, higher rate covering the open-ended period after the Commission's decision. The purpose of the two-step increase was to take account of precisely the problems presented here by rising interest rates. The period at issue in *Illinois Power* was also similar to the period in this case. The two-step increase had the effect of giving Illinois Power Co. a fair rate of return in the future without the necessity of filing a new rate with the Commission.

We applaud the Commission's resourcefulness in *Illinois Power*, and think the approach will probably prove useful in a wide variety of cases. However, the Commission's decision in that case does not make the result here unreasonable. *Illinois Power* was decided four months after the Commission's decision here. With interest rates fluctuating as greatly as they were over cycles measured in months, four months of continued high rates was enough to give the Commission much greater appreciation of market trends. We cannot say that the Commission's failure to adopt the *Illinois Power* approach here, and instead to adapt its traditional single-rate approach to the condi-

because East Tennessee is affiliated with Tenneco, Inc. The Commission did not explain how the fact that Tenneco owned most of its stock made petitioner a lesser risk. As the Commission noted in another case, it is required to assess the investment risk posed by petitioner, not the risk of the whole Tenneco system. *Consolidated Gas Supply Corp.*, Opinion No. 70, *supra*. There might be ways in which East Tennessee's affiliation with Tenneco does reduce the risk to investors, but the Commission's unsubstantiated conclusion that this is so is not rational. However, since we do not "review each detail of the Commission's decision" if the end result is not unreasonable, we do not find this a ground for reversal.

Finally, East Tennessee complains that the ALJ erroneously assumed the risk of petitioner's exhausting its gas supply could be recovered through depreciation, and the Commission adopted this finding. We do not agree with East Tennessee's interpretation of the Commission's opinion. Although the Commission agreed with the ALJ that East Tennessee's witness was "overly preoccupied" with East Tennessee's gas supply, the Commission does not seem to have also endorsed the ALJ's conclusion that depreciation would compensate for any such risk.

We affirm the Commission's order because we feel constrained to under the extremely limited scope of judicial review of FERC rate orders. Although we hold that the Commission's decision was not unreasonable in December, 1980, with the aid of hindsight not available to the Commission we are able to see that a 12.33 percent rate of return is clearly inadequate in light of the continued very high interest rates since that time. Petitioner could rectify this by filing a new rate. As the Commission recognized in rejecting the same solution to high future interest rates in *Illinois Power, supra*, "it is neither in the public interest nor in the interest of any of the parties to this case to encourage 'pancaking' of filings, numerous rate proceedings involving short periods of time and large backlogs of ongoing rate proceedings at this Commission."

tions of this case, makes the rate approved

*Illinois Power Co.*, 15 FERC ¶ 61,050 n.9. Further, filing a rate is an expensive and burdensome procedure, especially for a small company the size of East Tennessee. However, although we recognize these difficulties with filing a new rate the law does not permit any other solution to the problem caused by rising interest rates in this case, unless the Commission has the power to reopen a rate proceeding on its own initiative. Nothing in our opinion is meant to discourage the Commission from exercising this power if it exists to grant petitioner a rate more equitable under current conditions.